## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS
312 Montezuma Ave.
Santa Fe, New Mexico 87501

and

DEFENDERS OF WILDLIFE                    Case No. _____
1130 17th Street N.W.
Washington, D.C. 20036

and

SIERRA CLUB
1650 38th Street, Suite 102W
Boulder, Colorado 80301,

        Plaintiffs,

v.

KEN SALAZAR, Secretary,
U.S. Department of Interior
1849 C Street N.W.
Washington, D.C. 20240

and

U.S. BUREAU OF LAND MANAGEMENT
1849 C Street N.W.
Washington, D.C. 20240,

        Defendants.

---

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

---

## INTRODUCTION

    1.    The Powder River Basin in northeastern Wyoming and southeastern Montana is

the single-largest source of coal in the United States.  In 2008 alone, 42 percent of all coal

produced in the United States came from the Powder River Basin. Since 2000, Powder River Basin coal production has increased nearly 40 percent, from 360 million tons to a record 494 million tons annually. The top 10 producing coal mines in the United States are located in the Powder River Basin.

2.     Most of the coal mined from the Powder River Basin is shipped by rail and used by coal-fired power plants throughout the United States to generate electricity. Hundreds of plants of all generating capacities in 28 states from New Jersey to Oregon burn coal from the region. The vast majority of Powder River Basin coal is burned in the Midwest, with Missouri burning the most, followed by Texas, Kansas, Iowa, and Wisconsin.

3.     Carbon dioxide is part of a suite of greenhouse gases that cause climate change, and it comprises more than 85 percent of total greenhouse gas emissions in the United States. Coal-fired power plants are the largest source of carbon dioxide in the country, responsible for 32 percent of all carbon dioxide emissions nationwide.

4.     As the largest producer of coal in the United States, the Powder River Basin is linked to more carbon dioxide emissions than almost any other activity. In 2006, coal mining in the region led to the release of 795,695,068 metric tons of carbon dioxide—13 percent of the United States total and 40 percent of all carbon dioxide released by all coal-fired power plants in the country.

5.     In spite of the massive amount of carbon dioxide emissions resulting from Powder River Basin coal production, the U.S. Bureau of Land Management ("BLM") continues to issue new coal leases in the Basin without analyzing the regional environmental impacts—particularly climate change impacts—of increased carbon dioxide emissions ultimately resulting from coal leasing. The current "Lease-by-Application" process for coal in the Powder River Basin only

2

encourages BLM to analyze the environmental impacts of coal leasing on a parcel-by-parcel basis, and inhibits BLM from considering all environmental impacts of leasing in the Basin as a whole. As noted in greater detail below, the Lease-by-Application process is driven by coal companies and constricts BLM from limiting coal production based on environmental impacts caused by region-wide leasing.

6.     In 1990, BLM decertified the Powder River Basin as a Coal Production Region in order to use the site-specific Lease-by-Application process rather than the "competitive leasing" process for coal production regions that requires BLM to make leasing decisions based on, *inter alia*, environmental impacts caused by region-wide leasing.

7.     BLM used the site-specific Lease-by-Application process to authorize the sale and execution of two large coal leases in the Wyoming Powder River Basin. Collectively, these West Antelope II leases have the potential to produce approximately 406 million tons of coal during the lease period, resulting in 666 million metric tons of carbon dioxide emissions.

8.     In preparing the environmental impact statement in connection with the authorization referenced in the preceding paragraph, BLM failed to adequately analyze the impacts of increased carbon dioxide emissions and the climate change impacts resulting from burning coal produced by the West Antelope II leases and other leases in the Powder River Basin.

9.     BLM's decision to sell and execute the West Antelope II leases also sanctions activities that will result in the violation of limits on emission of air pollutants established under the Clean Air Act for the protection of human health and the environment.

10.     With this action, Plaintiffs WildEarth Guardians, Defenders of Wildlife, and the Sierra Club allege that the decertification of the Powder River Basin as a Coal Production

3

Region is no longer valid and is contrary to BLM's coal leasing regulations. 43 C.F.R. §§ 3400 *et seq*. Plaintiffs also allege that BLM's authorization of the West Antelope II coal leases violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief). The cause of action for Plaintiffs' claims arise under the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

12.     An actual and present controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because both the Defendants and plaintiff Defenders of Wildlife reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made here by BLM and the Secretary of Interior.

## PARTIES

14.     Plaintiff WILDEARTH GUARDIANS is a non-profit conservation organization with offices in New Mexico, Colorado, and Arizona. It brings suit on its own behalf and on behalf of its members. WildEarth Guardians ("Guardians") protects and restores the wildlife, wild places, and wild rivers of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate. Guardians has approximately 4,500 members, many of whom live, work and/or recreate in the Powder River Basin.

4

15.     Plaintiff DEFENDERS OF WILDLIFE is a national non-profit organization with over one million members and supporters nationwide. Defenders of Wildlife ("Defenders") is one of the country's leading science-based wildlife conservation organizations, and its mission includes the protection and restoration of America's native wildlife and the safeguarding of natural habitats and public lands. Defenders has worked extensively to protect wildlife, ecosystems, and aquatic resources throughout the country, including the protection of species from, the adaptation of species to, and the planning of federal and state agencies for the impacts of climate change. Defenders has approximately 781 members in Wyoming, including members who live, work, and/or recreate in the Powder River Basin.

16.     Plaintiff, SIERRA CLUB, is a national nonprofit organization of approximately 1.3 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass climate change, air quality impacts, water quality, wildlife, and other environmental concerns. The Sierra Club's highest national priority campaign is its "Move Beyond Coal" Campaign, which aims to transition the nation away from coal and toward clean energy solutions. The Wyoming Chapter of the Sierra Club has approximately 1,029 members in the state of Wyoming, many of whom live, work, and/or recreate in the Powder River Basin.

17.     Plaintiffs' members who live, work, recreate, and conduct other activities in the areas adjacent to the West Antelope II leases are affected by poor air quality associated with existing coal leasing in the Powder River Basin, and have a substantial interest in ensuring they breath the cleanest air possible. Plaintiffs and their members are also affected by increased

greenhouse gas emissions from existing coal leasing, and have a substantial interest in ensuring that the Secretary fully addresses the climate change impacts from the increased emissions resulting from the West Antelope II leases. Plaintiffs and their respective members use and enjoy the areas adjacent to the West Antelope II leases for recreational, scientific, aesthetic, conservation and other public purposes, and are harmed by the local aesthetic and environmental impacts of coal mining there. Plaintiffs and their respective members also have a substantial interest in ensuring that BLM complies with federal law, including the requirements of NEPA. Plaintiffs' and their respective members' interests have been, are being, and will continue to be irreparably harmed by BLM's decision to offer the West Antelope II coal leases in Campbell and Converse Counties, Wyoming, that will further degrade the air quality in the Powder River Basin and release significant amounts of greenhouse gases contributing to global climate change.

18.     Defendant KEN SALAZAR is sued in his official capacity as the Secretary of the Interior ("Secretary"). The Secretary is responsible for ensuring that the Bureau of Land Management's actions, such as authorizing the West Antelope II leases, comply with the requirements of NEPA and FLPMA. The Secretary is also responsible for ensuring whether the Bureau of Land Management's continuing decision to keep the Powder River Basin decertified as Coal Production Region is proper.

19.     The BUREAU OF LAND MANAGEMENT ("BLM") is an agency of the United States within the Department of Interior that is directly responsible for carrying out the Department's obligations under statutes and regulations governing coal leasing and development, including NEPA and FLPMA. BLM is also responsible for the 1990 decision decertifying the Powder River Basin as a Coal Production Region.

## FACTS AND LEGAL FRAMEWORK

### A.     The Powder River Basin and Decertification.

20.     The Powder River Basin is located in northeastern Wyoming and southeastern Montana, and covers an area of roughly 24,000 square miles.

21.     Some of the largest deposits of subbituminous coal in the world underlie the Powder River Basin, which is a type of coal favored for electrical generation due to its low sulfur content. These large coal deposits make the Powder River Basin the single largest source of coal in the United States. Wyoming Powder River Basin coal is shipped nationwide to 35 states. Approximately 2 percent of Wyoming Powder River Basin coal is burned in Wyoming.

22.     The U.S. Department of Energy ("DOE") noted that in 2008 alone, a record 495,964,000 tons of coal were mined from the Powder River Basin, comprising 42 percent of all coal produced in the United States and more than any other region of the country. DOE also noted that in 2008, the top 10 producing coal mines in the United States were all located in the Powder River Basin.

23.     The Powder River Basin was initially designated a "Coal Production Region" on November 9, 1979. *See* 44 Fed. Reg. 65,196 (Nov. 9, 1979). BLM considered several factors in making this designation:

> 1. Similarity in type and situation of coal; 2. General transportation and markets; 3. Broad economic and social-cultural similarities; 4. Administrative efficiency; and 5. Presence of Federal leases, preference right lease applications, and other indications of industry interest in Federal coal.

*Id.* In addition, BLM stated that in delineating Coal Production Regions, it included counties within which "substantial [coal] production may occur...." *Id.* at 65,197.

7

24.     The designation of Coal Production Regions serves three main purposes:

First, they are the geographic areas for which the Secretary, guided by the coal
production goals of the Department of Energy, establishes regional Federal coal leasing
targets. Second, they represent the administrative regions within which the BLM, with
guidance from regional coal teams, will conduct coal activity planning to identify
potential lease tracts and schedule competitive lease sales....Third, the coal production
regions serve to identify those areas in which the Department may offer competitive coal
leases for sale after land use planning, activity planning, and environmental analysis have
been completed.

*Id.* at 65,196.

25.     Federal regulations provide for two types of coal leasing processes: Competitive

Leasing and Lease by Application. Competitive Leasing applies in those areas BLM has

designated as Coal Production Regions. As part of this Competitive Leasing process, BLM

establishes regional leasing levels that include a ceiling for coal leasing, and delineates lease

boundaries based on an assessment of regional environmental impacts and public input. BLM

then auctions leases to the highest bidder. *See* 43 C.F.R § 3420.

26.     BLM's coal leasing regulations prescribe a number of requirements and

procedures that are normally followed when leasing occurs in a Coal Production Region. For

instance, 43 C.F.R. § 3420.2 requires, *inter alia*, that regional leasing levels be established, that a

regional leasing environmental impact statement ("EIS") be prepared, and that the Secretary of

the Interior take into account environmental effects when setting regional leasing levels. Further,

activity planning at 43 C.F.R. § 3420.3-1 requires that alternative leasing levels be analyzed in

the regional leasing EIS, and the tract ranking process at 43 C.F.R. § 3420.3-4(a)(1) requires

consideration of environmental effects when the regional coal team sets tract rankings.

27.     The Federal Coal Leasing Regulations authorize BLM to change Coal Production

Regions, or alter their boundaries, through publication of a notice of change in the Federal

Register. *See* 43 C.F.R § 3400.5.

8

28.     On January 9, 1990, BLM decertified the Powder River Coal Production Region. *See* 55 Fed. Reg. 784-85 (Jan. 9, 1990). BLM's rationale for decertification was "based largely on programmatic efficiencies associated with leasing-by-application" rather than an evaluation of any of the factors BLM considered when it designated the Powder River Basin Coal Production Region in 1979. Decertification allowed BLM to lease coal in the Powder River Basin using the streamlined Lease by Application process.

29.     The Lease-by-Application process applies where there is an "emergency need for unleased coal" or in areas "outside Coal Production Regions." 43 C.F.R § 3425.0-2. This process allows coal companies, rather than BLM, to delineate lease tracts and propose them for leasing. Lease proposals are not based on regional leasing levels or any regional environmental impact analysis. The Lease-by-Application process does not allow BLM to put a ceiling on coal leasing. *See* 43 C.F.R § 3425.

30.     Since decertification of the Powder River Federal Coal Region in 1990, Wyoming coal production increased from 184 million tons in 1990 to 444.9 million tons in 2006, an increase of 242 percent. Wyoming coal production has increased at a more rapid rate than other domestic coal production.

**B.      West Antelope II Coal Leases.**

31.     The Secretary authorized the West Antelope II coal leases under the Lease-by-Application process. This authorization implements the 1990 decision to decertify the Powder River Basin as a Coal Production Region.

32.     On April 6, 2005, Antelope Coal Company ("ACC"), the operator of the Antelope Mine, filed an application with BLM for federal coal reserves in a tract (hereafter the "West Antelope II" tract) located in the Wyoming Powder River Basin west of and immediately

9

adjacent to the Antelope Mine in Campbell and Converse Counties, Wyoming. ACC applied to lease the West Antelope II tract in order to extend the life of the Antelope Mine.

33.     The Antelope Mine produced 33.9 million tons of coal in 2006, which represents approximately 7.9 percent of the coal produced in the Wyoming Powder River Basin in 2006, and approximately 1.1 percent of nationwide estimated carbon dioxide emissions in 2006.

34.     The West Antelope II tract includes two non-contiguous blocks of approximately 429.7 million tons of in-place federal coal. BLM modified the West Antelope II tract into two distinct tracts of federal coal because it believed the north tract would be of competitive interest to more than one bidder. The north tract (WYW163340) includes 2,837.63 acres containing 350,263,000 tons of mineable federal coal in Campbell County, Wyoming. The south tract (WYW177903) includes 1,908.60 acres containing 56,356,000 tons of mineable federal coal in Converse County, Wyoming.

35.     Coal mined from the West Antelope II leases will be burned in coal-fired power plants across the United States.

36.     Mining of the West Antelope II leases will lead to the release of harmful air pollutants into the Powder River Basin.

**C.     Climate Change, Carbon Dioxide, and Coal.**

37.     Climate change has been intensively studied and acknowledged at the global, national, and regional scales. The Nobel Prize-winning Intergovernmental Panel on Climate Change ("IPCC") has determined that "[w]arming of the climate system is unequivocal" and, further, that "[o]bservational evidence from all continents and most oceans shows that many natural systems are being affected by regional climate changes, particularly temperature increases."

38.     Increases in the release of greenhouse gases by human activities have intensified the greenhouse effect, leading to climate change. According to a U.S. Global Change Research Program report entitled *Global Climate Change Impacts in the United States*:

> Observations show that warming of the climate is unequivocal. The global warming observed over the past 50 years is due primarily to human-induced emissions of heat-trapping gases. These emissions come mainly from the burning of fossil fuels (coal, oil, and gas) with important contributions from the clearing of forests, agricultural practices, and other activities.

39.     Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as greenhouse gases. The U.S. Environmental Protection Agency ("EPA") most recently found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations." 74 Fed. Reg. 66,496 (Dec. 15, 2009).

40.     In Secretarial Order No. 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (Sept. 14, 2009), the Secretary has proclaimed that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee." The Secretary proceeded to call for the development of a "unified greenhouse gas emission reduction program" among Department of Interior agencies.

41.     In Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities."

42.     In the Final EIS ("FEIS") for the West Antelope II leases, BLM outlined the impacts of climate change to the American West, stating:

> If global warming trends continue into the foreseeable future, Chambers (2006) indicates that the following changes may be expected to occur in the West:

11

- The amount and seasonal variability of precipitation will increase over most areas. IPCC (2001) climate model scenarios indicate that by 2100, precipitation will increase about 10 percent in summer, about 30 percent in fall, and 40 percent in winter. Less snowfall will accumulate in higher elevations, more precipitation will occur as rain, and snowmelt will occur earlier in the spring because of higher temperatures.

- Streamflow patterns will change in response to reduced snowpacks and increasing precipitation. Peak flows in spring are expected to occur earlier and be of lower magnitude because of snowpack changes. Runoff from greater amounts of winter rainfall will cause higher winter flows. Summer flows will be lower, but with higher variability depending on the severity of storm events.

- Some populations of native plants, invasive species, and pests will expand. Increasing amounts of atmospheric carbon dioxide and precipitation during the growing season will provide favorable growth conditions for native grasses, perennial forbs, woody species, and invasive annuals such as cheatgrass. Insect populations also will likely increase because milder winter temperatures will improve reproduction and survival rates.

- Fire frequency, severity, and extent will increase because of the increased availability of fine fuels (grasses, forbs, and invasives) and accumulation of fuels from previous growing seasons. Higher temperatures will extend the length of fire seasons. Expansion of pinyon-juniper species and increasing tree densities could increase the number of high severity crown fires. Higher rates of insect damage and disease also may increase fuel accumulations.

- Sensitive species and overall biodiversity will be reduced. High-elevation habitats will shrink in area or disappear as lower-elevation plant communities expand. It is probable that some mammalian, avian, and other species that currently inhabit these high-elevation habitats may become extinct. Higher rates of disease and insect damage also may pose threats to other sensitive plant and animal species.

43.     Carbon dioxide is the leading cause of climate change and the most emitted greenhouse gas in the United States. According to an EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2008* ("2010 GHG Inventory Report"), the U.S. emitted 7,668.43 million tons (6,956.8 million metric tons) of greenhouse gases in 2008, comprising 19 percent of human created greenhouse gases released globally. Of this total, carbon dioxide comprises more than 85 percent of total U.S. greenhouse gas emissions, or 6,526.9 million tons (5,921.2 million metric tons).

12

44.     EPA also determined in the 2010 GHG Inventory Report that the electricity generation sector is the largest source of greenhouse gases in the U.S., largely due to carbon dioxide emissions.  Coal-fired power plants release more than 80 percent of all greenhouse gases from the electricity generation sector, including more than 2.17 billion tons (1.96 billion metric tons) of carbon dioxide—nearly 30 percent of the nation's total greenhouse gas inventory and 33 percent of all carbon dioxide released in the U.S., making coal-fired power plants and the mines that supply them the largest source of carbon dioxide in the country.

**D.      Other Air Pollutants from Coal Production—Ozone, NO₂, and PM₁₀.**

45.     Surface coal mining activities generate various air pollutants including ozone precursors, $NO_2$, and particulate matter.  Tailpipe emissions from mining equipment and emissions from trains used to haul coal from mines produce ozone precursors.  Blasting of mine overburden produces gaseous clouds that contain $NO_2$.  Coal crushing, storing, and handling facilities are the most common sources of particulate matter.

46.     Ground-level ozone is a dangerous pollutant which causes a variety of significant adverse impacts to human health.  According to EPA, elevated levels of ozone have a "causal relationship[] with a range of respiratory morbidity effects, including lung function decrements, increased respiratory symptoms, airway inflammation, increased airway responsiveness, and respiratory-related hospitalizations and emergency department visits." 73 Fed. Reg. 16,436, 16,443-46 (March 27, 2008).  Furthermore, EPA has stated that the latest scientific evidence on ozone effects "is highly suggestive that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related mortality," including "premature mortality." *Id.* EPA has concluded that individuals with asthma are at particular risk from the adverse effects of ozone. *Id.*

47.     Ozone is a criteria pollutant under the federal Clean Air Act ("CAA"), 42 U.S.C.

§§ 7401 *et seq.* The CAA establishes a National Ambient Air Quality Standard ("NAAQS") for

each criteria pollutant that represents the maximum allowable concentration of each pollutant

that can occur in the air and still protect public health. *See* 42 U.S.C. § 7409. Currently, the

NAAQS limit ozone concentrations to no more than 0.075 parts per million ("ppm") over an

eight-hour period. According to EPA, an exceedance of the standard occurs whenever ambient

ozone concentrations reach 0.076 ppm or higher and a violation occurs whenever the three year

average of the fourth-highest annual eight-hour ozone concentrations is 0.076 ppm or higher.

48.     $NO_2$ is a criteria pollutant under the CAA. The $NO_2$ annual standard is 53 parts

per billion ("ppb"). On July 15, 2009, EPA proposed to supplement the annual standard with a

one-hour $NO_2$ standard of between 80 and 100 ppb. *See* 74 Fed. Reg. 34,404-66 (July 15, 2009).

EPA believed it was necessary to supplement the annual standard with a standard governing

short-term exposure because "recent studies provide scientific evidence that is sufficient to infer

a likely causal relationship between short-term $NO_2$ exposure and adverse effects on the

respiratory system." *Id.* at 34,410. According to EPA, "[e]pidemiologic evidence exists for

positive associations of short-term ambient $NO_2$ concentrations below the current NAAQS with

increased numbers of emergency department visits and hospital admissions for respiratory

causes, especially asthma." *Id.* at 34,413. EPA promulgated the final one-hour $NO_2$ standard of

100 ppb on February 9, 2010. *See* 75 Fed. Reg. 6,474-6,537 (Feb. 9, 2010).

49.     Particulate matter less than 10 microns in diameter, or $PM_{10}$, is a criteria pollutant

under the CAA. *See* 71 Fed. Reg. 61,144 (Oct. 17, 2006). The NAAQS limits hourly $PM_{10}$

concentrations to no more than 150 micrograms/cubic meter. *Id.* at 61,202. According to EPA,

health effects associated with short-term exposure to $PM_{10}$ include "aggravation of respiratory

and cardiovascular disease (as indicated by increased hospital admissions), increased respiratory

symptoms in children, and premature mortality." *Id.* at 61,178.

    **E.**    **The West Antelope II Leasing FEIS and Record of Decision.**

    50.    The National Environmental Policy Act ("NEPA") was enacted to ensure that

federal projects do not proceed until the environmental effects associated with those projects are

completely assessed and analyzed by the proponent federal agency. *See* 42 U.S.C. § 4332(2)(C).

    51.    NEPA requires the preparation of an environmental impact statement ("EIS") if a

proposed federal action has the potential to "significantly affect" the quality of the human

environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

    52.    An EIS must, *inter alia*, analyze alternatives to the proposed action as well as the

direct, indirect, and cumulative impacts associated with the proposed action. *See* 42 U.S.C. §

4332(2); 40 C.F.R. § 1508.9. The discussion of "alternatives to the proposed action" is the

"heart" of the NEPA process. 42 U.S.C. § 4332(C)(iii), (E); 40 C.F.R. § 1502.14. This

discussion is intended to provide "a clear basis for choice among options by the decisionmaker

and the public." 40 C.F.R. § 1502.14. Federal agencies must "[r]igorously explore and

objectively evaluate all reasonable alternatives." *Id.*

    53.    An EIS must include a discussion of methods to mitigate adverse environmental

consequences associated with the proposed action. *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

    54.    FLPMA requires BLM to manage public lands "under principles of multiple use

and sustained yield, in accordance with the land use plans" developed by BLM. 43 U.S.C. §

1732(a). Under FLPMA, BLM has the authority to regulate "the use, occupancy, and

development of the public lands." 43 U.S.C. § 1732(b).

55.     Any land use authorization by BLM shall "[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(B)(3).

56.     In 2008, BLM issued its FEIS for the West Antelope II Coal Lease Application. On March 25, 2010, the BLM Wyoming State Director signed the Record of Decision ("ROD") adopting Alternative 2, as analyzed and assessed in the FEIS.

57.     The FEIS analyzed five alternatives, including the No Action alternative, for the proposed action to hold a competitive lease sale and issue a lease for the federal coal lands included in the West Antelope II Tract as applied for by AAC. The selected alternative ("Alternative 2") proposed to divide the tract into two tracts and hold separate, competitive sealed-bid sales for each tract.

58.     Each of the action alternatives varied only with regard to tract configuration as it related to competitive interest. None of the action alternatives analyzed measures that would: (1) reduce or eliminate carbon dioxide emissions, (2) reduce or eliminate ozone, $NO_2$ or $PM_{10}$ emissions, or (3) reduce or eliminate adverse climate change impacts.

59.     Insofar as the analysis of air quality was concerned, BLM did not adequately analyze the direct, indirect, and cumulative impacts of ozone, $NO_2$, or $PM_{10}$ emissions from the West Antelope II Leases to Wyoming Powder River Basin's air quality.

60.     According to EPA monitoring data, ozone levels in Campbell County, Wyoming have exceeded the ozone NAAQS on 16 occasions since 2001. Two monitors are in operation in Campbell County, one in the Thunder Basin National Grassland and the other in southern Campbell County. The three-year average of the fourth-highest annual eight-hour ozone readings for the years 2006-2008 is 0.067 ppm at the South Campbell County Monitor and 0.072

ppm at the Thunder Basin Monitor—that is, 96 percent of the NAAQS and only 0.004 ppm short of violating the NAAQS. During this same three-year period, eight-hour ozone concentrations have peaked as high as 0.088 ppm.

61.     BLM's air quality analysis in the FEIS did not estimate ozone emissions from the West Antelope II Leases and did not analyze air quality impacts from ozone emissions. In the agency's response to FEIS Comments, BLM acknowledged that ozone is an issue of concern, stating that "[o]zone has been included in discussions on emissions of nitrogen oxide (NOx) since NOx is one of the main ingredients involved in the formation of ground level ozone." BLM mentioned ozone only once in the context of a discussion of NOx emissions in the FEIS by stating that NOx "is one of the main ingredients involved in the formation of ground level ozone." BLM did not mention the ozone NAAQS, nor did it discuss current ozone levels in Campbell County.

62.     BLM's air quality analysis in the FEIS did not analyze $NO_2$ emissions from the West Antelope II Leases on an hourly basis. In the FEIS, BLM claims that "[n]either the EPA nor the [Wyoming Department of Environmental Quality] have established NAAQS for $NO_2$ for averaging times shorter than one year." Prior to BLM's approval of the ROD, EPA supplemented the annual $NO_2$ standard with a one-hour NAAQS for $NO_2$ to protect public health from short-term $NO_2$ exposure.

63.     In the FEIS, BLM recognized that "$NO_2$ is by far the most toxic of several species of NOx." BLM continues to note that $NO_2$ "may cause significant toxicity because of its ability to form nitric acid with water in the eye, lung mucous membranes, and skin," "may cause death by damaging the pulmonary systems," and "may exacerbate pre-existing respiratory conditions, or increase the incidence of respiratory infections."

17

64.     In analyzing the $PM_{10}$ impacts of the West Antelope II Leases, BLM concluded that the West Antelope II Leases would comply with the twenty-four-hour $PM_{10}$ NAAQS. This conclusion is not supported by $PM_{10}$ monitoring data presented in the FEIS for the region around the existing West Antelope Mine. These data show 29 monitored exceedances of the twenty-four-hour $PM_{10}$ standard at seven operating mines in the Wyoming Powder River Basin between 2001 and 2006. In early 2007, nine exceedances were monitored at four mines. BLM also discloses in the FEIS that the cumulative impacts of the West Antelope II Leases would lead to future exceedances of the twenty-four-hour $PM_{10}$ NAAQS, with concentrations as high as 378.8 micrograms/cubic meter, even under a low production scenario.

65.     In analyzing and approving the West Antelope II Leases, BLM did not quantify or otherwise analyze carbon dioxide emissions from leasing activities and those emissions' contributions to climate change. In its ROD, BLM recognized that the release of greenhouse gases associated with the West Antelope II leases will contribute to climate change, and that reducing these emissions "would help to lessen any harmful effects that they may be causing to global climate." BLM did not analyze and assess such impacts resulting from the West Antelope II leases or their magnitude of contribution to climate change. BLM also did not consider measures to reduce or eliminate carbon dioxide emissions occurring as a consequence of the agency's decision to offer the West Antelope II Leases.

**F.     Procedural History.**

66.     On April 8, 2008, WildEarth Guardians submitted timely Comments on the West Antelope II Draft EIS.

18

67.    On January 20, 2009, WildEarth Guardians and the Sierra Club submitted timely joint Comments on the West Antelope II Draft EIS. On February 23, 2009 WildEarth Guardians and the Sierra Club submitted supplemental Comments on the West Antelope II Draft EIS.

68.    On April 8, 2008, Defenders of Wildlife submitted timely Comments on the West Antelope II Draft EIS.

69.    On May 3, 2010, WildEarth Guardians, Defenders of Wildlife, and the Sierra Club timely filed a Notice of Appeal and Petition for Stay with the Interior Board of Land Appeals over BLM's issuance of the Record of Decision adopting Alternative 2 and authorizing for sale the West Antelope II coal leases.

70.    On June 29, 2010, WildEarth Guardians, Defenders of Wildlife, and the Sierra Club filed a motion to voluntarily dismiss their Appeal when the IBLA did not stay BLM's decision to offer the West Antelope II leases. On July 1, 2010, the IBLA granted this dismissal.

## CLAIMS FOR RELIEF

### First Claim for Relief:
### The Secretary's Decertification of the Powder River Federal Coal Region is Invalid

71.    Plaintiffs incorporate by reference all preceding paragraphs.

72.    The Secretary's decision to offer the West Antelope II Leases for sale implements the 1990 decision decertifying the Powder River Basin as a Coal Production Region.

73.    In 1990, BLM decertified the Powder River Basin as a coal production region. *See* 55 Fed. Reg. 784-785 (Jan. 9, 1990). This decision declared that the Powder River Basin was no longer a "coal production region" under 43 C.F.R. § 3400.5.

74.    BLM's decision to decertify the Powder River Basin was predicated on the "programmatic efficiencies associated with leasing-by-application," the "reduced regional coal market," and "declining interest in coal leasing." 55 Fed. Reg. 784.

75.     Decertification has allowed BLM to utilize the streamlined Lease-by-Application process set forth under 43 C.F.R. § 3425, rather than the competitive leasing process under 43 C.F.R. § 3420. The Lease-by-Application process is only to be used where there is an "emergency need for unleased coal" or in areas "outside coal production regions." 43 C.F.R. § 3425.0-2. Federal regulations do not allow the process to be used to facilitate expansion of existing mines.

76.     Given the levels of coal production in the Powder River Basin, decertification is no longer appropriate.

77.     If the Powder River Basin were appropriately certified as a coal production region, BLM would be required to prepare a regional lease sale EIS "on all tract combinations selected by the regional coal team for the various leasing levels" and consider "[t]he site-specific potential environmental impacts of each tract being considered for lease sale" and "[t]he intraregional cumulative environmental impacts of the proposed leasing action and alternatives, and other coal and noncoal development activities." 43 C.F.R. § 3420.3-4(c)

78.     Because the West Antelope II coal leases were improperly authorized under the Lease-by-Application process, BLM has both failed to address the regional climate change and air quality impacts of coal leasing in the Powder River Basin and failed to establish regional leasing levels based on a consideration of climate change and air quality impacts. But for the 1990 decertification of the Powder River Basin, these impacts would be adequately addressed and would not adversely affect the Plaintiffs.

79.     Continuing decertification of the Powder River Basin as a Coal Production Region is contrary to BLM's coal leasing regulations. *See* 43 C.F.R. § 3400 *et seq.* Given current levels of coal production in the Powder River Basin, the Basin was required to have been

recertified as a Coal Production Region prior to BLM's authorization of the West Antelope II

coal leases so that they could have been approved under the Competitive Leasing process at 43

C.F.R. § 3420. The decision to approve the leases was therefore arbitrary and capricious and

otherwise not in accordance with law under 5 U.S.C. § 706(2).

**Second Claim for Relief:**
**Violation of NEPA – EIS Is Legally Inadequate**
**(Failure to Take a Hard Look at Impacts to the Environment and Reasonable Alternatives)**

80.     Plaintiffs incorporate by reference all preceding paragraphs.

81.     NEPA requires federal agencies to take a "hard look" at the environmental

consequences of their actions. 42 U.S.C. § 4332. NEPA's implementing regulations require

BLM to consider and assess the direct and indirect impacts of mining and burning coal from the

West Antelope II leases, as well as the cumulative environmental impacts of mining and burning

coal from the West Antelope II leases when added to other past, present, and reasonably

foreseeable future actions, including cumulative and similar actions. *See* 40 C.F.R. §§

1508.25(a)(2),(3), 1508.25(c)(3), 1508.7.

82.     NEPA and its implementing regulations also require BLM to include in EISs

"reasonable alternatives" to a proposed action that will avoid or minimize the action's adverse

effects on the quality of the human environment. 42 U.S.C. § 4222(C)(iii), (E); 40 C.F.R. §§

1500.2(e), 1502.14, 1508.9(b).  ·

83.     Additionally, NEPA's implementing regulations require that an EIS discuss

means to mitigate adverse environmental consequences. Mitigation includes, but is not limited

to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the

environment. *See* 40 C.F.R. § 1508.20.

21

84.     The FEIS is legally inadequate because BLM failed to analyze the indirect effects of carbon dioxide emissions resulting from the West Antelope II leases. Such impacts are indirect in that they "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Combustion of coal is a "logical consequence" of offering the West Antelope II Leases.

85.     The FEIS is legally inadequate because BLM failed to analyze the cumulative impacts of carbon dioxide emissions from all past, present, and reasonably foreseeable coal leasing and development, and other activities and development, in the Powder River Basin.

86.     The FEIS is legally inadequate because BLM failed to analyze how the direct, indirect, and cumulative greenhouse gas emissions associated with the West Antelope II Leases will influence climate change. In the ROD, BLM assumed that the release of greenhouse gases associated with the West Antelope II Leases will contribute to climate change. Despite this assumption, BLM made no attempt to analyze and assess such impacts and the magnitude of contribution to climate change.

87.     BLM also failed to analyze any mitigation measures that would reduce or eliminate carbon dioxide emissions and subsequent climate change impacts associated with these emissions.

88.     The FEIS is legally inadequate because BLM failed to adequately analyze the direct, indirect, and cumulative impacts to air quality resulting from ozone, $NO_2$, or $PM_{10}$ emissions from leasing activities. BLM also failed to analyze any mitigation measures that would reduce or eliminate ozone, $NO_2$, or $PM_{10}$ emissions.

89.     BLM also failed to analyze any reasonable alternative that would prevent or minimize carbon dioxide emissions and address subsequent climate change impacts resulting

from these emissions. In their Draft EIS comments, Plaintiffs proposed several reasonable alternatives for reducing carbon dioxide emissions including requiring capture and use of methane vented from coal mining activities; requiring more efficient mining equipment, such as mine hauling trucks; requiring the mine operator to secure carbon offsets before commencing coal mining activities; limiting annual coal production to reduce greenhouse gases from coal combustion; and alternatives that factor in the cost of greenhouse gas emissions and climate change when determining the fair market value of the coal to be leased.

90.     BLM failed to analyze any reasonable alternative that would prevent or minimize further degradation to Powder River Basin air quality from ozone, $NO_2$, or $PM_{10}$ emissions.

91.     BLM's approval and adoption of Alternative 2 on the basis of a legally inadequate EIS that failed to provide an adequate analysis of (1) air quality, carbon dioxide, and climate change impacts, (2) a reasonable range of alternatives, and (3) reasonable mitigation measures was arbitrary and capricious, and constitutes a violation of NEPA under the standards of the APA, 5 U.S.C. § 706(2).

### Third Claim for Relief:
### Violation of FLPMA – Failure to Comply With Air Quality Standards

92.     Plaintiffs incorporate by reference all the preceding paragraphs.

93.     FLPMA provides that BLM's land use plans must "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8).

94.     Both of BLM's applicable land use plans—the Casper and Buffalo Resource Management Plans ("RMPs")—explicitly provide for such compliance. The Casper RMP states that BLM will "[c]omply with applicable state and federal AAQS [ambient air quality standards] for criteria pollutant concentration levels associated with management actions." The Buffalo

RMP states that BLM will "minimize emissions that could result in acid rain, violations of air quality standards, or reduced visibility," and that the Agency will ensure its decisions are "conditioned to avoid violating Wyoming and national air quality standards."

95.    FLPMA and BLM's regulations prohibit agency action that is inconsistent with the land use plan. *See* 43 U.S.C. § 1732(a) (mandating that the Secretary "shall manage the public lands ... in accordance with the land use plans"); *see also* 43 C.F.R. § 1610.5-3(a) ("resource management authorizations and actions" must conform to the applicable resource management plan).

96.    FLPMA's implementing regulations require that each land use authorization made by BLM shall require compliance with federal air quality standards established pursuant to applicable federal law. *See* 43 C.F.R. § 2920.7(b)(3).

97.    The NAAQS for ozone, $NO_2$, and $PM_{10}$ are federal air quality standards designated pursuant to 42 U.S.C. § 7408.

98.    Although the air quality monitors in the region have detected numerous exceedances of the ozone NAAQS, BLM did not even attempt to analyze the impacts of the West Antelope II Leases to ambient ozone concentrations. Therefore, there is no evidence that BLM complied with FLPMA's substantive air quality standard protection requirements in authorizing the West Antelope II Leases for sale.

99.    BLM did not analyze the impacts of the West Antelope II Leases to the recently adopted hourly $NO_2$ NAAQS. Therefore, there is no evidence that BLM complied with FLPMA's substantive air quality standard protection requirements in authorizing the West Antelope II Leases for sale.

100.    BLM's own FEIS shows that on a cumulative basis, the West Antelope II Leases will exceed various $PM_{10}$ standards and that numerous exceedances of the twenty-four-hour $PM_{10}$ NAAQS have been recorded in recent years within the Powder River Basin. BLM does not deny that exceedances of the twenty-four-hour $PM_{10}$ NAAQS have been recorded, or that the FEIS projects exceedances of the NAAQS. Rather, in the agency's response to FEIS comments, BLM asserts that it simply has no authority to address these impacts. Such an assertion conflicts with FLPMA's requirement that the Agency's actions "provide for compliance with...Federal air...standards[.]" 43 U.S.C. § 1712(c)(8). The governing RMPs explicitly echo this requirement, stating that BLM shall both comply with Federal air quality standards and minimize emissions.

101.    BLM's failure to provide for compliance with federal air quality standards for ozone, $NO_2$, and $PM_{10}$ prior to authorizing the sale of the West Antelope II leases violates FLPMA and its implementing regulations, and is arbitrary, capricious, and contrary to law under the standards of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that the Powder River Basin must be recertified as a Coal Production Region before the West Antelope II leases are granted;

B.    Declare that Defendants' actions are in violation of NEPA and FLPMA, and their implementing regulations, as set forth above;

C.    Declare unlawful and set aside Defendants' decision approving the sale of the West Antelope II coal leases until such a time as BLM has re-certified the Powder River Basin as a Coal Production Region and has complied with NEPA and FLPMA;

D.      Adjudge and declare that BLM's FEIS and ROD are arbitrary and capricious and contrary to law, and vacate said FEIS and ROD as invalid;

E.      Enjoin any coal mining activities on the West Antelope II lease parcels until such a time as BLM has complied with NEPA and FLPMA and adequately analyzed the direct, indirect, and cumulative impacts of its leasing decision;

F.      Enter such temporary, preliminary, or permanent injunctive relief as specifically prayed for by Plaintiffs hereinafter;

G.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable statutes; and

H.      Grant such additional and further relief as the Court may deem just and appropriate.

Respectfully submitted on this 13th day of July 2010.

_____
Matt Kenna (Bar No. CO0028)
Public Interest Environmental Law
679 E. 2nd Ave., Suite 11B
Durango, Colorado 81301
(970) 385-6914
matt@kenna.net

_____
Adam Kron (Bar No. 992135)
Defenders of Wildlife
1130 17th Street N.W.
Washington, D.C. 20036
(202) 772-3224 (office)
(202) 682-1331 (fax)
akron@defenders.org

Attorneys for Plaintiffs

26