## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS,
DEFENDERS OF WILDLIFE, and
SIERRA CLUB,

     *Plaintiffs*,

  v.

KEN SALAZAR, Secretary, U.S.
Department of Interior, U.S. BUREAU OF
LAND MANAGEMENT, and U.S. FISH
AND WILDLIFE SERVICE,

     *Defendants*,

ANTELOPE COAL LLC, NATIONAL
MINING ASSOCIATION, and STATE OF
WYOMING,

     *Intervenors/Defendants*.

Civil Action No. 10-01174 (CKK)

## MEMORANDUM OPINION
(December 6, 2010)

Plaintiffs Wildearth Guardians, Defenders of Wildlife, and the Sierra Club (collectively,

"Plaintiffs") commenced this action on July 13, 2010, challenging the U.S. Department of

Interior's decision to authorize the leasing of certain public lands in northeastern Wyoming for

coal mining operations. Named as defendants are Ken Salazar, in his official capacity as

Secretary of the U.S. Department of Interior, the U.S. Bureau of Land Management (the

"Bureau"), and the U.S. Fish and Wildlife Service (collectively, the "Federal Defendants").

Presently before the Court are three separate motions – one by [11] Antelope Coal LLC

("Antelope"), a second by [28] the National Mining Association ("NMA"), and a third by [14]

the State of Wyoming ("Wyoming") – to intervene as defendants in this action (collectively, the

"Putative Intervenors" or, simply, the "Intervenors").  Plaintiffs contest the three motions to intervene, albeit only in part and in a severely limited fashion; the Federal Defendants, for their part, take no position on the Putative Intervenors' participation in this action.  For the reasons set forth below, the Court shall grant all three motions, subject to certain limitations and conditions.

## I. PRELIMINARY MATTERS

For purposes of resolving the motions to intervene presently before the Court, the well-pleaded allegations in the Complaint are assumed to be true.[1]  *Secs. & Exch. Comm'n v. Prudential Secs. Inc.*, 136 F.3d 153, 156 n.4 (D.C. Cir. 1998) (citing *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988)).  Additionally, where appropriate, the Court shall refer to the non-conclusory allegations and record evidence offered by the Putative Intervenors in support of their motions to intervene.  *See Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("motions to intervene are usually evaluated on the basis of well pleaded matters in the motion, the complaint, and any responses of opponents to intervention."); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001) ("Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections.").  While the Court shall cite only to those portions of the record immediately relevant to its disposition today, the Court notes that it has considered each of the parties' submissions and the attachments thereto, including, but not limited to, the following documents:

---

[1]  While this action is in its early stages, Plaintiffs have twice revised the Complaint in this action.  *See* Compl., Docket No. [1]; First Am. Compl., Docket No. [18]; Supplemented Compl. ("3d Compl."), Docket No. [34].

- **Antelope's Motion to Intervene:** Antelope's Unopposed Mot. to Intervene as Def. ("Antl.'s Mem."), Docket No. [11]; Antelope's Reply to Pls.' Resp. to Wyoming's Mot. to Intervene ("Antl.'s 1st Reply"), Docket No. [24]; Antelope's Reply to Pls.' Resp. to NMA's Mot. to Intervene ("Antl.'s 2d Reply"), Docket No. [31]; Antelope's Not. of Suppl. Authority in Supp. of its Unopposed Mot. to Intervene, Docket No. [36].[2]

- **NMA's Motion to Intervene:** NMA's Mot. to Intervene as Def. with Supp. Stmt. of P. & A. ("NMA's Mem."), Docket No. [28]; Decl. of Katie Sweeney in Supp. of NMA's Mot. to Intervene as Def. ("Sweeney Decl."), Docket No. [28-1]; Pls.' Resp. to Mot. to Intervene by NMA ("Pls.' Opp'n to NMA's Mot."), Docket No. [30]; Reply Stmt. of P. & A. in Supp. of NMA's Mot. to Intervene as Def., Docket No. [32].

- **Wyoming's Motion to Intervene:** Mem. of Law in Supp. of Wyoming's Mot. to Intervene ("Wyo.'s Mem."), Docket No. [14-1]; Aff. of Harold D. Kemp ("Kemp Aff."), Docket No. [14-2]; Pls.' Resp. to Mot. to Intervene by Wyoming ("Pls.' Opp'n to Wyo.'s Mot."), Docket No. [17]; Wyoming's Reply to Pls.' Resp. to Wyoming's Mot. to Intervene ("Wyo.'s Reply"), Docket No. [19]; Pls.' Not. of Suppl. Authority, Docket No. [25].

Before proceeding further, the Court pauses to make an overarching observation about the nature of Plaintiffs' opposition to the present motions, which is limited. Significantly, although the motions now before the Court are contested in part, Plaintiffs have completely failed to rebut or otherwise dispute, in any meaningful sense, the factual showing made by each of the Putative Intervenors in support of their respective applications to intervene in this action. Accordingly, unless otherwise noted, the Court shall treat the Putative Intervenors' description of the relevant facts as conceded for purposes of resolving the present motions. *See Tanter v. Dep't of Interior*, 432 F. Supp. 2d 58, 62 (D.D.C. 2006) (treating factual allegations as conceded based upon party's failure to contest those allegations); *Cobell v. Norton*, 355 F. Supp. 2d 531, 543 (D.D.C.

---

[2] Although two of Antelope's submissions are styled as replies to Plaintiffs' oppositions to the other Putative Intervenors' motions to intervene, they are substantively directed towards the merits of Antelope's motion to intervene. *See generally* Antl.'s 1st Reply; Antl.'s 2d Reply.

2005) (same). This observation may be unnecessary, as there appears to be relatively little disagreement on the underlying facts; nevertheless, the Court notes that it renders its decision, as it must, upon the record created by the parties, to which Plaintiffs' contributions have been few.

## II. BACKGROUND

Given the procedural posture of the case, nothing in the Court's opinion today should be construed as opining on the ultimate merits of the parties' respective legal claims and defenses or the likelihood that Plaintiffs will be able to secure the relief requested, nor as taking any factual assertions to be conclusively established for purposes of this litigation.

### A. The Leasing of Public Lands for Coal Mining Operations

The present action touches upon the Bureau's practice and procedure with respect to the leasing of public lands for coal mining operations, of which only the broadest contours require discussion here. The relevant federal regulations contemplate two distinct coal leasing processes, commonly referred to as the "Competitive Leasing" process and the "Lease-by-Application" process. 3d Compl. ¶ 28; *see generally* 43 C.F.R. pt. 3420 (regulations governing the two processes).[3] The two processes may be described more fully as follows:

> • **The Competitive Leasing Process:** The Competitive Leasing process applies in areas designated as "Coal Production Regions," the boundaries of which the Bureau is empowered to alter after publication of an appropriate notice. 3d Compl. ¶¶ 28, 30. Primarily an agency-driven process, the Competitive Leasing process begins when the Bureau identifies public lands for potential use for coal mining operations and offers competitive coal leases

---

[3] Strictly speaking, both processes are forms of competitive leasing, as both contemplate an open, public, and competitive sealed-bid process and preclude the Bureau from issuing a coal lease unless the highest bid received meets or exceeds fair market value. *See* 43 C.F.R. §§ 3422.1, 3422.2, 3425.4. Nevertheless, consistent with the parties' usage, the Court shall employ the "Competitive Leasing" terminology to refer to the specific process applicable in areas designated as "Coal Production Regions."

4

for sale. *Id.* ¶¶ 27-28. When operating under the Competitive Leasing process, the Bureau is required to consider the regional environmental impacts of prospective coal mining operations and consider such impacts when setting leasing levels on a region-wide basis. *Id.* ¶¶ 28-29.

- **The Lease-by-Application Process:** In contrast to the Competitive Leasing process, the Lease-by-Application process is animated primarily by coal companies, which assume responsibility in the first instance for identifying public lands for potential use and proposing specific tracts for leasing. *Id.* ¶¶ 5, 32. As characterized by Plaintiffs, the more site-specific Lease-by-Application process inhibits the Bureau's ability to limit coal mining operations based upon the cumulative environmental impacts caused by region-wide coal mining activities. *Id.*

B.    *The Decertification of the Powder River Basin*

At one point in time, a total of six regions across the United States were designated as Coal Production Regions, within which the Competitive Leasing process applied. NMA's Mem. at 6; *see also* Public Participation in Coal Leasing, 64 Fed. Reg. 52239-02, 52240 (Sept. 28, 1999) (identifying the six Coal Production Regions). By the late 1980s, however, the Bureau started decertifying Coal Production Regions due to a declining demand for coal and perceived inefficiencies attendant to the Competitive Leasing process. NMA's Mem. at 6; *see also* Public Participation in Coal Leasing, 64 Fed. Reg. at 52240 (noting that, "[f]or a number of years, [the Bureau] has competitively leased Federal coal exclusively through the leasing-on-application process."). The Powder River Basin, an area covering approximately 24,000 square miles across northeastern Wyoming and southeastern Montana, was the last of the six regions to be decertified. 3d Compl. ¶¶ 1, 23; NMA's Mem. at 6; *see also* Proposed Decertification of All or a Portion of the Powder River Coal Production Region ("Decert. Not."), 54 Fed. Reg. 6339-01 (Feb. 9, 1989).

The Powder River Basin, the single largest source of coal in the United States, was first

designated as a Coal Production Region in November 1979. 3d Compl. ¶¶ 1, 26; *see also* Identification of Coal Production Regions, 44 Fed. Reg. 65196 (Nov. 9, 1979). For the next decade, leasing within the Powder River Basin occurred pursuant to the Competitive Leasing process. On January 9, 1990, however, the Bureau decertified the region, thereby replacing the Competitive Leasing process with the Lease-by-Application process. 3d Compl. ¶¶ 6, 31. The Bureau's stated rationales for decertification included the administrative efficiencies associated with the Lease-by-Application process and the then-limited leasing interest in the region. *Id.* ¶ 31; *see also* Decert. Not., 54 Fed. Reg. at 6340 ("The reason for . . . decertification is to allow for an accommodation of the limited leasing potential within the subject areas, during the current soft coal market, and with the maximum administrative efficiency"). In the twenty years since decertification, coal production in the Powder River Basin has increased significantly, and at a higher rate than other domestic coal production. 3d Compl. ¶ 33. To this day, coal leasing in the Powder River Basin remains subject to the Lease-by-Application process.

C.      *The Bureau's Decision Authorizing the Leasing of the West Antelope II Tracts*

Although this action unquestionably implicates broader issues concerning the leasing of public lands for coal mining operations, the immediate dispute is actually quite narrow. On April 6, 2005, pursuant to the Lease-by-Application process, Antelope filed an application with the Bureau requesting that certain public lands containing federal coal reserves in the Wyoming portion of the Powder River Basin – namely, approximately 4,746 acres of land immediately adjacent to Antelope's pre-existing coal mining operations in Campbell and Converse Counties, Wyoming – be offered up for competitive lease sale to interested parties. *Id.* ¶ 35; *see also* Not. of Intent to Prepare an Envtl. Impact Stmt., 71 Fed. Reg. 61064-02 (Oct. 17, 2006). Ultimately,

the Bureau authorized the sale of leases covering the designated area. 3d Compl. ¶¶ 7, 34; *see also* Not. of Availability of Record of Decision, 75 Fed. Reg. 16502-01 (Apr. 1, 2010); Record of Decision ("Rec.") (Mar. 25, 2010), *available at* http://www.blm.gov/wy/st/en/info/NEPA/ cfodocs/West_Antelope_II.html.

More specifically, the Bureau decided to divide the land identified by Antelope into two separate tracts – designated as the "West Antelope II" tracts – reasoning that the northernmost tract would be of greater interest to companies other than Antelope. 3d Compl. ¶¶ 63-64; Rec. at 6. Each tract would be offered for lease at separate, competitive sealed-bid sales. Rec. at 6. In the event the highest bid received at each sale met or exceeded the fair market value for the leases and all other leasing requirements were met, the leases would be issued to the successful qualified bidder or bidders. *Id.*

Notably, in the course of reaching this decision, the Bureau prepared an Environmental Impact Statement (the "EIS"), a subject of considerable dispute among the parties. 3d Compl. ¶ 63; *see also* Not. of Availability of Final Envtl. Impact Stmt., 74 Fed. Reg. 4228-01 (Jan. 23, 2009); Final Envtl. Impact Stmt. (Dec. 8, 2008), *available at* http://www.blm.gov/wy/st/en/info/ NEPA/cfodocs/West_Antelope_II.html. The EIS, designed to provide agency decision-makers and the public with a complete and objective evaluation of the environmental impacts associated with the contemplated leasing of the West Antelope II tracts, is several hundred pages in length and took over two years to prepare. Rec. at 9-10; Not. of Intent to Prepare an Envtl. Impact Stmt., 71 Fed. Reg. 61064-02 (Oct. 17, 2006); Final Envtl. Impact Stmt.

D. *The Contours of the Present Action*

Plaintiffs challenge the Bureau's decision to authorize the leasing of the West Antelope II

tracts on four principal fronts.

First, Plaintiffs allege, in essence, that the Bureau acted arbitrarily, capriciously, or otherwise not in accordance with law by authorizing the leasing of the West Antelope II tracts without first re-certifying the Powder River Basin as a Coal Production Region. 3d Compl. ¶¶ 5-7, 98-105. By Plaintiffs' account, if the Powder River Basin had been re-certified as a Coal Production Region, any coal leasing – including the future leasing of the West Antelope II tracts – would have to be approved pursuant to the Competitive Leasing process, which imposes upon the Bureau an obligation to evaluate the regional environmental impacts of prospective coal mining operations when setting regional leasing levels, as opposed to the more site-specific Lease-by-Application process actually used to approve the leasing of the West Antelope II tracts.

Second, Plaintiffs contend that the Bureau violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, by, *inter alia*, failing to adequately analyze the direct and indirect effects of carbon dioxide emissions that would result from leasing the West Antelope II tracts (including the ultimate combustion of the coal mined from those tracts), as well as the cumulative environmental impacts from other past, present, and reasonably foreseeable activities in the Powder River Basin. 3d Compl. ¶¶ 8, 106-118.

Third, Plaintiffs assert that the Bureau violated the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.*, by failing to appropriately analyze the impact of leasing the West Antelope II tracts pursuant to federal air quality standards. 3d Compl. ¶¶ 9, 119-128. For example, Plaintiffs allege that the Bureau failed to properly account for permissible levels of ambient ozone concentrations. *Id.* ¶ 9.

Fourth, and finally, Plaintiffs allege that the Bureau and the U.S. Fish and Wildlife

Service violated their obligations under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, by failing to conduct an appropriate formal consultation regarding the potential impact of leasing the West Antelope II tracts upon threatened and endangered wildlife. *Id.* ¶¶ 10, 129-135.

## III. LEGAL STANDARD

Rule 24(a) of the Federal Rules of Civil Procedure governs intervention as a matter of right.[4] That provision provides, in relevant part, that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Consistent with this language, the D.C. Circuit Court of Appeals has identified four requirements for intervention as a matter of right:

    (1)    **Timeliness:** First, an application to intervene in a pending action must be timely. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008). Whether a given application is timely is a context-specific inquiry, and courts should take into account (a) the time elapsed since the inception of the action, (b) the probability of prejudice to those already party to the proceedings, (c) the purpose for which intervention is sought, and (d) the need for intervention as a means for preserving the putative intervenor's rights. *Id.* at 886.

    (2)    **Interest:** Second, the putative intervenor must have a "legally protected" interest in the action. *Id.* at 885. The test operates in large part as a "practical guide," with the aim of disposing of disputes with as many concerned parties as may be compatible with efficiency and due process. *United States v. Morten*, __ F. Supp. 2d __, 2010 WL 3069060, at * 5 (D.D.C. Aug. 4, 2010).

---

[4] The Federal Rules of Civil Procedure contemplate two types of intervention: permissive intervention and intervention as a matter of right. Fed. R. Civ. P. 24. Because the Court concludes that the Putative Intervenors are each entitled to intervene in this action as a matter of right, the Court shall omit discussion of the standard governing permissive intervention. *See Am. Horse Prot. Assoc., Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001) (concluding that movant was entitled to intervene as of right and declining to reach question of permissive intervention).

(3) **Impairment of Interest:** Third, the action must threaten to impair the putative intervenor's proffered interest in the action. *Karsner*, 532 F.3d at 885. The inquiry is not a rigid one: consistent with the Rule's reference to dispositions that may "as a practical matter" impair the putative intervenor's interest, Fed. R. Civ. P. 24(a)(2), courts look to the "practical consequences" of denying intervention, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (citing *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977)).

(4) **Adequacy of Representation:** Fourth, and finally, no existing party to the action may adequately represent the putative intervenor's interests. *Karsner*, 532 F.3d at 885. Significantly, the putative intervenor's burden here is *de minimis*, and extends only to showing that there is a possibility that its interests may not be adequately represented absent intervention. *Fund for Animals*, 322 F.3d at 735.

In addition to these four requirements, which emanate from the text of Rule 24(a) itself, a putative intervenor in this Circuit must further establish that it has constitutional standing to participate in the action. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1146 (D.C. Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3501 (2010); *but see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) (noting that "[r]equiring standing of someone who seeks to intervene as a defendant runs into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction.") (internal citations omitted), *cert. denied*, 542 U.S. 915 (2004). Where a party seeks to intervene as a defendant in order to uphold or defend agency action, it must establish (a) that it would suffer a concrete injury-in-fact if the action were to be set aside, (b) that the injury would be fairly traceable to the setting aside of the agency action, and (c) that the alleged injury would be prevented if the agency action were to be upheld. *Am. Horse Prot. Assoc.*, 200 F.R.D. at 156; *see also Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 68 (D.D.C. 2006) (identifying requirements for constitutional standing in an action involving

agency action).[5]

Once a district court concludes that a party has a right to intervene, the inquiry is not necessarily at an end. Even where intervention is a matter of right, district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action. *Fund for Animals*, 322 F.3d at 737 n.11 (citing favorably to Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment); *see also Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 383 (1987) (Brennan, J., concurring) ("restrictions on participation may also be placed on an intervenor of right and on an original party"). The district court's discretion to impose reasonable restrictions on participation is consonant with its inherent power to manage the litigation before it, *Beauregard, Inc. v. Sword Servs. LLC*, 107 F.3d 351, 353 (5th Cir. 1997), as well as a necessary instrument in accommodating the two conflicting goals of intervention: *i.e.*, "to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending," *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969).

## IV.  DISCUSSION

The Court's discussion here proceeds in two steps: the Court first addresses the merits of each of the three motions to intervene on an individual basis; thereafter, the Court considers what conditions or restrictions should be imposed upon all the Putative Intervenors' participation in

---

[5]  In most instances, the standing inquiry will fold into the underlying inquiry under Rule 24(a): generally speaking, when a putative intervenor has a "legally protected" interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*. *See Roeder*, 333 F.3d at 233 ("any person who satisfies Rule 24(a) will also meet Article III's standing requirement."); *Fund for Animals*, 322 F.3d at 735 (conclusion that putative intervenor has constitutional standing is alone sufficient to establish that it has a legally protected interest in the action).

this action.

*A.* *The Putative Intervenors are Entitled to Intervene as a Matter of Right*

1. <u>Antelope's Motion to Intervene</u>

Antelope seeks to intervene in this action as a matter of right under Rule 24(a)(2) or, alternatively, permissively under Rule 24(b).  Antl.'s Mem. at 1.  Notably, Plaintiffs have chosen not to oppose Antelope's intervention in this action, with the proviso that Plaintiffs have requested that certain conditions and restrictions be placed upon all the Putative Intervenors' participation in this action.[6]  *See generally* Pls.' Opp'n to NMA's Mot.; Pl.'s Opp'n to Wyo.'s Mot.  Therefore, apart from considering whether Antelope's participation in this action should be subject to any limitations, Antelope's motion to intervene as a matter of right in this action stands conceded.  *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997) (a district court may in its discretion "rel[y] on the absence of a response as a basis for treating [a] motion as conceded"); *see also Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009) (where party fails to respond to arguments in opposition papers, the court may treat them as conceded) (citing *Fed. Deposit Ins. Co. v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997)).  In any event, even considering the merits of Antelope's motion, it is clear that Antelope satisfies each of the four requirements for intervention as a matter of right under Rule 24(a).

a. Timeliness

The first factor, the timeliness of the motion, requires little discussion: Antelope filed its

---

[6] Technically, Plaintiffs made their request only in the context of their oppositions to the motions to intervene by NMA and Wyoming.  Nevertheless, as framed therein, Plaintiffs' request extends to Antelope as well, and Antelope has clearly construed it in this way.  *See generally* Antl.'s 1st Reply; Antl.'s 2d Reply.

motion to intervene on August 16, 2010, eighty-five days before Plaintiffs filed the current iteration of the Complaint in this action and ninety-nine days before the Federal Defendants filed an answer to that iteration. Under these circumstances, Plaintiffs cannot credibly claim (nor have they) that they would be prejudiced by Antelope's intervention at this juncture. Considered alongside Antelope's demonstrated interest in intervening as a defendant in this action, the Court concludes that the motion is timely.

### b. Interest

The agency decision challenged in this action has its origins in Antelope's request that the West Antelope II tracts immediately adjacent to its current coal mining operations be offered up for competitive lease sale to interested parties; unsurprisingly, Antelope intends to bid on the leases when they are put up for sale. 3d Compl. ¶ 35; Antl.'s Mem. at 1-2. Indeed, in rendering its decision, the Bureau assumed that Antelope would be the successful bidder on both tracts, and that the mineable federal coal on those lands would be used to extend the life of Antelope's existing coal mining operations. Rec. at 6. The Bureau specifically found that, were the application rejected, Antelope's current coal reserves would be depleted in little over a decade, rendering it incapable of operating competitively in the national coal market. *Id.* at 8; *see also* Antl.'s Mem. at 5. These interests suffice to support intervention as a matter of right.

### c. Impairment of Interest and Standing

Simply put, the Bureau's decision below was favorable to Antelope, and the present action is a direct attack on that decision. Plaintiffs seek, among other things, an order vacating the Bureau's decision to allow the leasing of the West Antelope II tracts and precluding any future leasing of those tracts until such time as the Bureau has re-certified the Powder River

Basin as a Coal Production Region and otherwise conducted environmental analyses in the manner envisioned by Plaintiffs. It is impossible to predict whether the same outcome would be reached upon remand. Furthermore, an adverse decision in this action would, at a bare minimum, prevent Antelope from bidding on, securing, and developing the West Antelope II tracts in the foreseeable future. With Antelope's current coal reserves having a horizon of little more than a decade, this action may have the "practical consequence" of threatening Antelope's ability to remain competitive in the national coal market in both the short and long term, *Fund for Animals*, 322 F.3d at 735, and an adverse decision in this action would, "as a practical matter," threaten to impair Antelope's interests, Fed. R. Civ. P. 24(a)(2). Similarly, were this Court to vacate the Bureau's decision below, Antelope would suffer a concrete injury-in-fact fairly traceable to that disposition; accordingly, Antelope also has standing to intervene in this action. *Am. Horse Prot. Assoc.*, 200 F.R.D. at 156.

              d.        Adequacy of Representation

Antelope has met its burden of establishing that no other current or contemplated party would necessarily adequately represent its interests in this action. With respect to the Federal Defendants and Wyoming, it is well-established that governmental entities generally cannot represent the "more narrow and parochial financial interest" of a private party. *Fund for Animals*, 322 F.3d at 737 (internal quotation marks omitted). Meanwhile, as described in greater detail below, NMA has broader regional and national interests in this action, and is unlikely to afford Antelope's more discrete and particularized interests the same primacy as would Antelope itself.

2.    NMA's Motion to Intervene

Plaintiffs have opposed NMA's motion to intervene in this action, but only insofar as NMA seeks to intervene in this action as a matter of right under Rule 24(a).  *See generally* Pls.' Opp'n to NMA's Mot.  Plaintiffs do not oppose NMA's request, made in the alternative, that it be permitted to intervene in this action permissively under Rule 24(b).  However, even as regards intervention as a matter of right, Plaintiffs' opposition is confined to addressing the "adequacy of representation" prong of the Rule 24(a) inquiry.  *Id.* at 1-3.  Accordingly, Plaintiffs effectively concede that NMA has met the remaining three requirements for intervention as a matter of right – *i.e.*, timeliness, interest, and impairment of interest – and the only question is whether NMA's interests in this action would be adequately represented by other current or contemplated parties.  *See Phrasavang*, 656 F. Supp. 2d at 201 (where party fails to respond to arguments in opposition papers, the court may treat them as conceded).  Nevertheless, even considering the merits of NMA's motion, the record created by the parties supports only one conclusion: NMA has satisfied each of the four requirements for intervention as a matter of right under Rule 24(a).

a.    Timeliness

The first factor – the timeliness of the motion – again requires little discussion: NMA filed its motion to intervene on October 13, 2010, twenty-seven days before Plaintiffs filed the current iteration of the Complaint in this action and forty-one days before the Federal Defendants filed an answer to that iteration.  This action remains in its early stages: the administrative record is yet to be filed with the Court and no briefing schedule for dispositive motions has been set.  As before, Plaintiffs cannot credibly claim (nor have they) that they would be prejudiced by NMA's intervention at this juncture.  Considered alongside NMA's demonstrated interest in intervening

15

as a defendant in this action, the Court concludes that the motion is timely.

    b.   Interest and Standing

  Although there are myriad reasons to conclude that NMA has standing to participate as a defendant in this action, only two need be mentioned here. NMA is the national trade organization for the mining industry, and the only national organization representing mining interests, which indisputably extend to the availability and regulation of coal leasing on federal lands. Sweeney Decl. ¶ 2. NMA's membership includes nearly every coal company doing business in the Powder River Basin. *Id.* ¶ 3. As such, its membership includes the universe of entities that would benefit from a competitive lease sale of the West Antelope II tracts and suffer a concrete injury-in-fact in the event the Bureau's decision were to be set aside. *Am. Horse Prot. Assoc.*, 200 F.R.D. at 156. At the same time, these entities constitute the class most likely to benefit from various similar lease applications currently pending in the Powder River Basin,[7] and the breadth of Plaintiffs' challenge may very well have practical implications for the approval of those applications. Sweeney Decl. ¶ 5; *see also* Rec. at 3; Wyo.'s Mem. at 11. Because these entities would have standing to sue in their own right, because the availability and regulation of coal leasing on federal lands are germane to NMA's purpose, and because neither the Plaintiffs' claims nor the relief requested requires the individual corporate entities to participate in this action, NMA has standing to sue on behalf of its members. *See Military Toxics Project v. Envtl. Prot. Agency*, 146 F.3d 948, 953-54 (D.C. Cir. 1998) (outlining requirements for associational

---

[7] For example, in July and August of this year, the Bureau issued decisions resolving two other applications in the Powder River Basin, known as "Belle Ayr North" and "Caballo West" tracts. *See* Not. of Availability, 75 Fed. Reg. 44980-01 (July 30, 2010) (Belle Ayr North); Not. of Availability, 75 Fed. Reg. 47623-01 (Aug. 6, 2010) (Caballo West). Both applications were filed by NMA members. Sweeney Decl. ¶ 4.

standing) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

For the same reasons, NMA has an interest sufficient to support intervention as a matter of right under Rule 24(a). *See Fund for Animals*, 322 F.3d at 735 (conclusion that putative intervenor has constitutional standing is alone sufficient to establish that it has a legally protected interest in the action).

c.     Impairment of Interest

Although styled as a discrete challenge to the leasing of the West Antelope II tracts, this action carries with it potentially broad implications for the leasing of public lands for coal mining operations, and, for various reasons, an adverse decision in this action threatens to impair the local, regional, and national interests of NMA and its members. The Court shall only mention some of those reasons here, which serve to illustrate NMA's unique position in this litigation.

First, an adverse decision in this action may have implications for coal leasing across the Powder River Basin, separate and part from the resolution of Antelope's discrete application. Plaintiffs plainly seek a broad-based order precluding any future leasing in the Powder River Basin until such time as the Bureau has re-certified it as a Coal Production Region. Presently, there are multiple lease applications pending in the Wyoming portion of the Powder River Basin, all seeking approval pursuant to the Lease-by-Application process. If accepted, Plaintiffs' contentions that decertification is no longer appropriate and that the Lease-by-Application process is invalid would cast substantial doubt on the validity of these other pending applications, and may have the practical consequence of delaying or preventing the approval of similar pending lease applications in the Wyoming portion of the Powder River Basin. 3d Compl. ¶¶ 102, 104-105; Sweeney Decl. ¶ 5. Indeed, in rendering its decision, the Bureau

considered the effect of rejecting similar coal leasing applications across the Powder River Basin, predicting that many existing mines in the region would cease operations after depleting their current reserves (within eight to sixteen years), and would thereafter be unable to compete with other mining interests to meet future coal demand. Rec. at 9. Therefore, as the representative of the universe of potential bidders for leases made available in the Powder River Basin, an adverse decision in this action would, "as a practical matter," threaten to impair NMA's interests. *Fund for Animals*, 322 F.3d at 735.

Second, certain aspects of Plaintiffs' suit carry with them potential implications for federal coal leasing nationally. Simply by way of example, Plaintiffs press in this action a particular view of the required environmental analyses. Plaintiffs contend that the Bureau was required to consider, among other things, both the direct and indirect effects of carbon dioxide emissions that would result from leasing the West Antelope II tracts (including the ultimate combustion of the coal mined from those tracts), as well as the cumulative environmental impacts from other past, present, and reasonably foreseeable activities. If Plaintiffs' position were accepted, it would likely be of concern to domestic coal producers generally. Because NMA's membership includes every significant coal company operating in the United States, Sweeney Decl. ¶ 3, an adverse decision in this action may have practical consequences for its members' interests.

In the same vein, in rendering its decision, the Bureau considered the impact that rejecting similar coal leasing applications across the Powder River Basin (which, by Plaintiffs' own account, is the single largest source of coal in the United States) would have on coal producers nationally. Rec. at 9. In this regard, the Bureau found that producers in the Powder River Basin

18

have secured an increasing share of the national market primarily because production in the region has been less costly, more environmentally compliant, and more successful in terms of post-mining reclamation projects. *Id.* at 8-9. Accordingly, the Bureau concluded that limiting production in the Powder River Basin would likely result in increased production by other domestic (and, potentially, international) coal producers, resulting in more costly coal production with a greater residual environmental impact. In short, the Bureau thought a contrary decision might have potential reverberations across the national coal market.

### d. Adequacy of Representation

NMA has met its minimal burden of establishing that no other current or contemplated party would necessarily adequately represent its interests in this action. With respect to the Federal Defendants and Wyoming, governmental entities generally cannot represent the "more narrow and parochial financial interest" of a private party that is not burdened with the responsibility of balancing multiple competing public interests. *Fund for Animals*, 322 F.3d at 737 (internal quotation marks omitted). Antelope, meanwhile, has a more narrow focus on protecting the specific decision below, and does not share NMA's concern with the regional and national implications that may emanate from Plaintiffs' action. For example, Plaintiffs maintain that decertification is no longer appropriate in the Powder River Basin given the levels of coal production in the region. 3d Compl. ¶ 102. The other five former Coal Production Regions have been decertified for a similar period of time, but have not experienced the same rate of increase in coal production. *Id.* ¶ 33. As such, Antelope might be inclined to defend the Bureau's decision below on the grounds that re-certification of the Powder River Basin is inappropriate given the increased leasing interest in the region arising since decertification. NMA, meanwhile,

19

may be inclined to defend the Bureau's decision with an argument that would more broadly support the continued decertification of all six former Coal Production Regions. Accordingly, although the Court does not doubt that Antelope and NMA share certain concerns, it is not difficult to imagine how their interests "might diverge during the course of litigation." *Fund for Animals*, 322 F.3d at 736.

In opposing NMA's intervention as a matter of right on the ground that its interests are already adequately represented, Plaintiffs rely exclusively upon *Earthworks v. U.S. Dep't of Interior*, No. 09 Civ. 1972 (HHK), 2010 WL 3063139 (D.D.C. Aug. 3, 2010). Plaintiffs offer no analysis or explanation, and make no attempt to respond to NMA's detailed showing of how its interests diverge from the interests of the Federal Defendants and the other Putative Intervenors. In any event, *Earthworks* does not support, as Plaintiffs' contend, the proposition that "where existing mining interests have already intervened . . . new mining interests may not intervene as of right since their interests are already adequately represented." Pl.'s Opp'n to NMA's Mot. at 2. In *Earthworks*, the Court first *granted* the motions to intervene as a matter of right brought by representatives of participants in the mining industry, including NMA. *Earthworks*, 2010 WL 3063139, at *1. Only later, when two regional mining associations also sought to intervene, did the Court find intervention as a matter of right inappropriate (but even then, the Court granted leave to intervene permissively). *Id.* at *1-2. Significantly, the only divergence in interests articulated by the second set of intervenors was that they represented individuals and small companies, as opposed to the larger mining interests represented by the first set of intervenors. *Id.* at *1. The Court merely held that such a slight divergence, without more, was insufficient to establish that the second set of intevernors' interests were inadequately represented. *Id.* at *2.

For the reasons set forth above, NMA's interests sufficiently diverge from those of the other parties in this action, and therefore NMA simply is not similarly situated to the second set of intervenors in *Earthworks*.

        3.        <u>Wyoming's Motion to Intervene</u>

As with Antelope's motion to intervene, Plaintiffs do not oppose Wyoming's intervention in this litigation either permissively or as of right.  Pls.' Opp'n to Wyo.'s Mot. at 1.  Instead, Plaintiffs' opposition focuses exclusively on the propriety of imposing conditions and restrictions upon Wyoming's intervention.  *Id.* at 1-3.  Therefore, apart from considering whether Wyoming's participation in this action should be subject to any limitations, Wyoming's motion to intervene as a matter of right in this action stands conceded.  In any event, even considering the merits of Wyoming's motion, it is clear that Wyoming satisfies each of the four requirements for intervention as a matter of right under Rule 24(a).

        a.        Timeliness

Wyoming's motion to intervene is timely.  Wyoming filed its motion to intervene on August 30, 2010, seventy-one days before Plaintiffs filed the current iteration of the Complaint in this action and eighty-five days before the Federal Defendants filed an answer to that iteration. Plaintiffs cannot credibly claim (nor have they) that they would be prejudiced by Wyoming's intervention at this juncture.  When considered alongside Wyoming's interest in intervening as a defendant in this action, the Court concludes that the motion is timely.

        b.        Interest

Wyoming has at least three interests in intervening in the present action, any one of which would alone suffice to support intervention.

First, Wyoming has an interest in supporting the Bureau's decision to authorize the leasing of the West Antelope II tracts. The West Antelope II tracts are in the Wyoming portion of the Powder River Basin, and Wyoming participated as an advisor-member of the team charged with reviewing Antelope's application, as well as in the preparation of the accompanying EIS. 3d Compl. ¶ 35; Wyo.'s Mem. at 2-3; *see also* Kemp. Aff. ¶ 4. Indeed, the Bureau expressly identified two divisions of the Wyoming Department of Environmental Quality (the "WDEQ") as "cooperating agencies" in the development of the EIS – namely, the Land Quality Division, which regulates surface coal mining operations on both federal and non-federal lands in Wyoming, and the Air Quality Division (the "WDEQ-AQD"), which regulates air borne emissions and administers federal air quality standards in Wyoming. Rec. at 2. Both agencies expended significant time and energy in assisting the Bureau in preparing the EIS. Wyo.'s Mem. at 4.

Second, Wyoming has an interest in preserving its role in regulating environmental quality within its borders, and ensuring that the development of coal mining operations within its territory continues in a safe and environmentally responsible manner. Wyoming's involvement in the West Antelope II application process is merely illustrative of its broader role in regulating the environmental impacts of coal development activities within its borders. Simply by way of example, the WDEQ-AQD, which regulates air borne emissions and administers federal air quality standards in Wyoming, was charged with considering permit applications and air quality analyses submitted by Antelope to ensure that the proposed use of the West Antelope II tracts would comply with federal and state standards. Wyo.'s Mem. at 10.

Third, and finally, Wyoming has an interest in protecting its financial and socioeconomic

stake in the development of coal mining operations in Wyoming. As noted by the Bureau in rendering its decision, the leasing of federal coal reserves provides Wyoming and affected county governments with income in the form of lease bonus payments, lease royalty payments, and tax payments. Rec. at 9. Over the last ten years, the total receipts from these revenue sources have been substantial. Kemp. Aff. ¶¶ 1-3. Indeed, coal production in the Powder River Basin is one of the largest contributors to the welfare of Wyoming, and a large component of local economies. Wyo.'s Mem. at 11-12.

c.     Impairment of Interest and Standing

For at least three reasons, an adverse decision in this action would, "as a practical matter," threaten to impair each of Wyoming's interests. Fed. R. Civ. P. 24(a)(2). These same reasons support the conclusion that Wyoming has standing to intervene in this action: were the Bureau's decision below to be set aside, Wyoming would suffer a concrete injury-in-fact fairly traceable to that disposition. *Am. Horse Prot. Assoc.*, 200 F.R.D. at 156.

First, Wyoming participated in the preparation of the current EIS, which is several hundred pages in length and took over two years to prepare. The setting aside of the Bureau's decision below would require the preparation of a new EIS in order to lease the West Antelope II tracts for coal mining operations and, by extension, would require Wyoming to expend additional time and resources, with the ultimate outcome uncertain.

Second, although framed in part as a targeted challenge to the leasing of the West Antelope II tracts, this action carries with it potentially broad implications for the leasing of public lands for coal mining operations in Wyoming. By way of example, Plaintiffs contend that the Bureau could not authorize the West Antelope II tracts without first analyzing both the direct

23

and indirect effects of carbon dioxide emissions that would result from leasing the West Antelope II tracts (including the ultimate combustion of the coal mined from those tracts), as well as the cumulative environmental impacts from other past, present, and reasonably foreseeable activities in the Powder River Basin. If Plaintiffs' position prevails, it would surely have "practical consequences" for Wyoming's interest in preserving its role in regulating environmental quality within its borders. *Fund for Animals*, 322 F.3d at 735.

Third, and finally, setting aside the Bureau's decision below would, at the very least, delay the timetable for the leasing of the West Antelope II tracts and prevent Wyoming from securing mineral bonus payments, federal mineral royalties, and severance taxes on the use of those lands in the near future. Plaintiffs' arguments, moreover, may very well have the practical consequence of delaying or preventing the approval of multiple similar pending lease applications in the Wyoming portion of the Powder River Basin. Indeed, Plaintiffs seek a broad-based declaration that the entire Powder River Basin must be re-certified as a Coal Production Region. In short, without opining on the merits of Plaintiffs' arguments or the likelihood that they will be able to secure the relief requested, there is little doubt that resolution of this action in Plaintiffs' favor would affect Wyoming's financial and socioeconomic stake in the development of coal mining operations within its borders.

d.    Adequacy of Representation

Wyoming has met its *de minimis* burden of establishing that neither the current nor contemplated parties would necessarily adequately represent its interests in this action. Recently, in *Earthworks v. U.S. Dep't of Interior*, No. 09 Civ. 1972 (HHK), 2010 WL 3063143 (D.D.C. Aug. 3, 2010), the district court addressed a similar set of facts in an action challenging a

regulation promulgated by the Bureau and other federal agencies in connection with mining claims. In granting the State of Alaska's motion to intervene as a matter of right, the court concluded that "[b]ecause Alaska's interests in the natural resources within state borders and the economic effects on the state of mining regulation are not necessarily represented by federal agencies or private companies," Alaska had shown that its interests may not have been adequately represented by existing parties, which include both federal defendants and private intervenors. *Id.* at *2. Likewise, here, although there are certainly shared concerns, it is not difficult to imagine how the interests of Wyoming and the other defendants "might diverge during the course of litigation." *Fund for Animals*, 322 F.3d at 736. The mere fact that other defendants might hypothetically take Wyoming's interests into account when shaping their arguments does not mean that they would afford the same primacy to Wyoming's interests in, for instance, maintaining its unique role in regulating coal mining operations and environmental quality or its financial and social economic interests in the development of coal mining operations within its borders.

B.      *Conditions upon Intervention*

As described above, even where the Court concludes that intervention as a matter of right is appropriate, its inquiry is not necessarily at an end: district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action. *Fund for Animals*, 322 F.3d at 737 n.11; *see also San Juan Cnty., Utah v. United States*, 503 F.3d 1163, 1189 (10th Cir. 2007) (en banc) (practical considerations may "justify limitations on the scope of intervention [as of right]"); *Beauregard*, 107 F.3d at 352-53 ("it is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right.").

Having concluded that Antelope, NMA, and Wyoming (hereinafter, the "Intervenors") may each intervene in this action as defendants under Rule 24(a), the Court now considers what conditions, if any, to impose upon their participation.

The inquiry is necessarily context-specific, and the conditions should be tailored to fit the needs of the particular litigation, the parties, and the district court. In the past, courts have barred intervenors from injecting collateral issues into the litigation. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11 n.8 (D.D.C. 2009) (granting intervention of right but prohibiting intervenors from raising new claims or collateral issues); *Cnty. of San Miguel, Colorado v. MacDonald*, 244 F.R.D. 36, 48 n.17 (D.D.C. 2007) (limiting intervention of right to claims within the scope of the complaint, but declining to impose other conditions). Other courts have required intervenors to consult with one another prior to filing papers with the Court and restricted their presentations to non-cumulative arguments. *See, e.g.*, *Earthworks*, 2010 WL 3063143, at *2 (granting intervention as a matter of right but requiring consultation with federal defendants and restricting presentation to arguments not advanced by other parties). In the end, the primary limitation on the district court's discretion is that any conditions imposed should be designed to ensure the fair, efficacious, and prompt resolution of the litigation. *See United States v. S. Florida Water Mgmt. Dist.*, 922 F.2d 704, 710 (11th Cir.) (district court may condition intervention "on such terms as will be consistent with the fair, prompt conduct of this litigation."), *cert. denied*, 502 U.S. 953 (1991); *United States v. Duke Energy Corp.*, 171 F. Supp. 2d 560, 565 (M.D.N.C. 2001) ("Applicants have an unconditional right to intervene, but this does not prevent the imposition of reasonable limitations on [their] participation to ensure the efficient adjudication of the litigation."). To achieve this salutary purpose, the district court

should remain attuned to the two conflicting goals of intervention: *i.e.*, "to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending." *Smuck*, 408 F.2d at 179.

Although it shares the concern that the scope of this action risks multiple, duplicative presentations, the Court declines Plaintiffs' invitation to require the Intervenors to consolidate all motions, responsive filings, and briefs. Given the institutional constraints associated with joint briefing, including the understandable reluctance to share work product, a court should not mandate complete joint briefing lightly. Mindful of the divergence of the Intervenors' interests in this action, and confident that the efficient adjudication of this action may be met through the imposition of less onerous conditions, the Court considers such a restriction to be inappropriate in this case. Nevertheless, in order to ensure the fair and efficacious resolution of this action, the Court shall require the Intervenors to comply with the following conditions:

- The Intervenors shall meet and confer prior to the filing of any motion, responsive filing, or brief to determine whether their positions may be set forth in a consolidated fashion – separate filings by the Intervenors shall include a certificate of compliance with this requirement and briefly describe the need for separate filings;

- The Intervenors shall confine their arguments to the existing claims in this action and shall not interject new claims or stray into collateral issues;

- Memoranda of points and authorities filed by the Intervenors in support of or in opposition to any motion in this action shall not, without further leave of the Court and good cause shown, exceed twenty-five (25) pages, and reply memoranda shall not exceed ten (10) pages; and

- In the event that a motion for summary judgment is filed in this action, the Intervenors shall file a joint statement of facts with references to the administrative record consistent with Local Rule LCvR 7(h)(2) – to the extent the Intervenors cannot agree on the inclusion of particular facts in their joint statement, they may identify such additional facts in bullet-point format in their respective memoranda of points and authorities.

The Court finds that the foregoing conditions strike the appropriate balance between ensuring the expedient resolution of this action while preserving a space for the Intervenors to articulate their respective positions and interests.

## V. CONCLUSION

For the foregoing reasons, the Court shall GRANT the motions by [11] Antelope, [28] NMA, and [14] Wyoming to intervene in this action as defendants as a matter of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, subject to the conditions and limitations described above. An appropriate Order accompanies this Memorandum Opinion.

Date: December 6, 2010

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge