**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILDEARTH GUARDIANS,
DEFENDERS OF WILDLIFE, and
SIERRA CLUB,

     *Plaintiffs*,

  v.

KEN SALAZAR, Secretary, U.S.
Department of Interior, U.S. BUREAU OF
LAND MANAGEMENT, and U.S. FISH
AND WILDLIFE SERVICE,

     *Defendants*,

ANTELOPE COAL LLC, NATIONAL
MINING ASSOCIATION, and STATE OF
WYOMING,

     *Defendant-Intervenors*.

Civil Action No. 10-01174 (CKK)

**MEMORANDUM OPINION**
(May 8, 2011)

     Plaintiffs Wildearth Guardians, Defenders of Wildlife, and the Sierra Club (collectively,

"Plaintiffs") commenced this civil action challenging the federal government's decision to

authorize the leasing of certain public lands in northeastern Wyoming for coal mining operations.

Named as defendants are Ken Salazar, in his official capacity as Secretary of the United States

Department of the Interior (the "Secretary"), the United States Bureau of Land Management (the

"BLM"), and the United States Fish and Wildlife Service (collectively, the "Federal

Defendants").  Intervening as defendants are Antelope Coal LLC ("Antelope"), the State of

Wyoming, and the National Mining Association (collectively, the "Defendant-Intervenors").[1]

Presently before the Court are two essentially coterminous motions—the Defendant-Intervenors'

[52] Motion for Partial Judgment on the Pleadings and the Federal Defendants' [53] Motion for

Partial Judgment on the Pleadings. Based on the parties' submissions, the relevant authorities,

and the record a whole, the Court shall grant both of the pending motions.[2]

## I. STATUTORY AND REGULATORY BACKGROUND

The Mineral Leasing Act of 1920 (the "Act"), 30 U.S.C. §§ 181 *et seq.*, provides that

"[d]eposits of coal . . . and lands containing such deposits owned by the United States . . . shall

be subject to disposition in the form and manner provided by this chapter." 30 U.S.C. § 181.

Under the Act, the Secretary is permitted to lease public lands for coal mining operations upon

conducting a competitive bidding process:

> The Secretary of the Interior is authorized to divide any lands subject
> to this chapter which have been classified for coal leasing into leasing
> tracts of such size as he finds appropriate and in the public interest
> and which will permit the mining of all coal which can be
> economically extracted in such tract and thereafter he shall, in his
> discretion, upon the request of any qualified applicant or on his own
> motion, from time to time, offer such lands for leasing and shall

---

[1] This Court previously granted the Defendant-Intervenors' motions to intervene in this action as a matter of right, subject to certain limitations and conditions. *See Wildearth Guardians v. Salazar*, 272 F.R.D. 4 (D.D.C. 2010). The Court shall refer to the Federal Defendants and the Defendant-Intervenors collectively as "Defendants."

[2] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Pls.' Supplemented Compl. for Declaratory J. & Injunctive Relief ("Suppl. Compl."), ECF No. [34]; Def.-Intervenors' Mem. of P. & A. in Supp. of Mot. for Partial J. on the Pleadings, ECF No. [52]; Fed. Defs.' Mem. of Law in Supp. of Their Mot. for Partial J. on the Pleadings, ECF No. [53-1]; Pls.' Mem. in Opp'n to Mots. for Partial J. on the Pleadings ("Pls.' Opp'n"), ECF No. [54]; Def.-Intervenors' Reply Mem. in Supp. of Mot. for Partial J. on the Pleadings, ECF No. [55]; Fed. Defs.' Reply Br. in Supp. of Their Mot. for Partial J. on the Pleadings, ECF No. [56].

award leases thereon on competitive bidding.

30 U.S.C. § 201(a)(1). While the Act mandates that any coal leasing authorized by the Secretary be done by competitive bidding and prescribes certain terms and conditions for such leasing—for example, by requiring accepted bids to meet or exceed the fair market value of the coal in question—the Act has little to say about the competitive bidding process itself. Instead, Congress elected to confer upon the Secretary "sweeping authority" to promulgate regulations designed to carry out the statutory command. *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1040 (D.C. Cir. 2002). The Act provides that "[t]he Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189.

Pursuant to that authority, the Secretary enacted regulations describing how the BLM would "conduct competitive leasing of rights to extract [f]ederal coal." 43 C.F.R. § 3420.0-1. The regulations contemplate two separate coal leasing processes—specifically, the "competitive regional leasing" process and the "leasing-by-application" process. *See generally* 43 C.F.R. pt. 3420. Both processes are forms of competitive leasing, as both contemplate an open, public, and competitive sealed-bid process and preclude the BLM from issuing a coal lease unless the highest bid received meets or exceeds fair market value. *See* 43 C.F.R. §§ 3422.1, 3422.2, 3425.4.

The competitive regional leasing process is primarily agency-driven, with the BLM identifying public lands for prospective use and offering coal leases for sale. *See* Public Participation in Coal Leasing, 64 Fed. Reg. 52,239, 52,240 (Sept. 28, 1999). The competitive regional leasing process applies only in areas designated as "coal production regions," which are creatures of regulation and the boundaries of which the BLM is empowered to alter:

> The Bureau of Land Management shall establish by publication in the Federal Register coal production regions. A coal production region may be changed or its boundaries altered by publication of a notice of change in the Federal Register. Coal production regions shall be used for establishing regional leasing levels.

43 C.F.R. § 3400.5. In the notice of proposed rulemaking, the BLM stated that the provision was designed to "authorize[] the Bureau of Land Management to establish coal production regions for the purpose of setting coal leasing levels and for other coal management purposes." Proposed Rules, 46 Fed. Reg. 61,390, 61,391-61,392 (Dec. 16, 1981). The regulations do not require the BLM to establish specific coal production regions nor provide any express guidance as to when and where the establishment of such regions would be appropriate.[3] Nonetheless, once the BLM has established a coal production region, the regulations specify how the BLM should go about setting "regional leasing levels." 43 C.F.R. § 3420.2. Specifically, when setting regional leasing levels, the BLM must—in consultation with other federal agencies, state and local governments, tribes, and regional coal teams—take into account such factors as national energy needs, industry interest in coal development, and the potential economic, social, and environmental effects of coal leasing on the region. *Id.* § 3420.2(c).

The leasing-by-application process, in contrast, is primarily applicant-driven, with the applicant assuming responsibility for identifying public lands for potential use and proposing specific tracts for leasing. *See* 43 C.F.R. §§ 3425.0-3425.5. The leasing-by-application process applies in two circumstances—specifically, in "areas outside coal production regions" and in areas within coal production regions "where an emergency need for unleased coal deposits is

---

[3] In contrast, the regulations do specify "the process for identifying, ranking, analyzing, selecting, and scheduling" specific lease tracts. 43 C.F.R. § 3420.3-1.

demonstrated." 43 C.F.R. §§ 3425.0-2, 3425.1-5. While the leasing-by-application process is not similarly structured around regional leasing levels, the BLM must nevertheless perform an environmental analysis under the leasing-by-application process. *See* 43 C.F.R. § 3425.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Certification and Decertification of the Powder River Basin as a Coal Production Region*

The Powder River Basin covers an area of approximately 24,000 square miles across northeastern Wyoming and southeastern Montana. Suppl. Compl. ¶ 23. In 1979, the BLM established several coal production regions; included among them was the Powder River Coal Production Region. *See* Identification of Coal Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. 65,196, 65,196 (Nov. 9, 1979). As a result, any leasing within the region was presumptively required to be conducted in accordance with the competitive regional leasing process, which remained the state of affairs for the next decade.

The notice published in the Federal Register included the following statement concerning the basis for the BLM's decision to establish the various coal production regions in 1979:

> In delineating the coal production regions set out in this notice, the Department has considered the following factors: 1. Similarity in type and situation of coal; 2. General transportation and markets; 3. Broad economic and social-cultural similarities; 4. Administrative efficiency; and 5. Presence of federal leases, preference right lease applications, and other indications of industry interest in Federal coal.

Identification of Coal Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. at 65,196. Furthermore, in the course of explaining why some counties were excluded from certain coal production regions—not the Powder River Coal Production Region—the BLM "noted . . . that if future circumstances indicate that substantial production may occur from these counties

subsequent boundary changes can be made to any of the coal production regions set out in this notice to reinstate these counties into the coal region." *Id.* at 65,197.

In 1989—ten years after the Powder River Coal Production Region was first established—the BLM solicited public comments on the proposed total or partial decertification of the Powder River Coal Production Region, citing such considerations as "limited leasing interest in the region, soft market conditions for the foreseeable future, [] public input," and "administrative efficiency." Proposed Decertification of All or a Portion of the Powder River Coal Production Region, 54 Fed. Reg. 6,339, 6,339-6,340 (Feb. 9, 1989); *see also* Powder River Regional Coal Team Activities: Public Meeting Announcement, 54 Fed. Reg. 35,941 (Aug. 30, 1989). In so doing, the BLM observed that "if the region were partially or totally decertified, then these areas would be opened to leasing-by-application," but left open the possibility "for the re-establishment of the regional activity planning process, should market conditions strengthen and more widespread leasing again become[] necessary." Proposed Decertification of All or a Portion of the Powder River Coal Production Region, 54 Fed. Reg. at 6,339-6,340.

On January 9, 1990, the BLM decertified the Powder River Coal Production Region as a coal production region, which had the effect of replacing the competitive regional leasing process with the leasing-by-application process in that area. *See* Decertification of the Powder River Coal Production Region, 55 Fed. Reg. 784 (Jan. 9, 1990). According to the notice published in the Federal Register, the BLM received sixteen written responses supporting total or partial decertification, and no letters of opposition. *Id.* at 784. During a public meeting, three parties proposed retaining the Powder River Coal Production Region in its existing form, including the Powder River Basin Resource Council. *Id.* Ultimately, the BLM adopted the recommendation

of the regional coal team that the Powder River Coal Production Region be completely decertified subject to certain conditions. *Id.* Accordingly, beginning in early 1990, "[f]ederal coal lease applications [could] . . . be filed in accordance with 43 C.F.R. § 3425"—that is, the leasing-by-application process. *Id.* at 785.

Since decertification, coal production in the Powder River Basin has increased nearly 242%, from 184 million tons in 1990 to 444.9 million tons in 2006. Suppl. Compl. ¶ 33. Since 2000, production has increased nearly 40%. *Id.* ¶ 1. In 2008, 42% of all coal produced in the United States came from the Powder River Basin. *Id.* The ten highest producing coal mines in the United States are all located in the Powder River Basin. *Id.* Throughout this period of increasing production in the Powder River Basin, coal leasing has been conducted according to the leasing-by-application process.

**B.**      ***The BLM's Decision to Authorize the Leasing of the West Antelope II Tracts***

On April 6, 2005, Antelope filed an application with the BLM pursuant to the leasing-by-application process, requesting that certain public lands adjacent to Antelope's pre-existing coal mining operations in Campbell and Converse Counties, Wyoming—approximately 4,746 acres of land within the Powder River Basin containing approximately 429.7 million tons of in-place federal coal—be offered up for competitive lease sale to interested parties. Suppl. Compl. ¶¶ 34-35, 37; *see also* Notice of Intent (NOI) to Prepare an Environmental Impact Statement (EIS), 71 Fed. Reg. 61,064, 61,065 (Oct. 17, 2006). Ultimately, on March 25, 2010, the BLM decided to divide the land into two separate tracts—designated as the "West Antelope II" tracts—and to offer each tract for lease at separate, competitive sealed-bid sales, reasoning that the northernmost tracts would be of greater interest to companies other than Antelope. Suppl.

Compl. ¶¶ 37, 63-64; *see also* Notice of Availability of the Record of Decision, 74 Fed. Reg. 16,502 (Apr. 1, 2010).  In the event the highest bid received at each sale met or exceeded the fair market value for the leases and all other leasing requirements were met, the leases would be issued to the successful qualified bidder or bidders.  In the course of reaching this decision, the BLM prepared an Environmental Impact Statement, a subject of considerable dispute among the parties.  Suppl. Compl. ¶ 63; *see also* Notice of Availability of Final Environmental Impact Statement, 74 Fed. Reg. 4,228 (Jan. 23, 2009).

### III.  LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The appropriate standard for reviewing a motion for judgment on the pleadings is "virtually identical" to that applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 221 (D.D.C. 2010).  Because a Rule 12(c) motion "would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation," the district court must approach such motions "with the greatest of care" and deny it "if there are allegations in the complaint which, if proved, would provide a basis for recovery."  *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 520 (2006).  The district court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *Baumann*, 744 F. Supp. 2d at 222.

A complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief," Fed. R. Civ. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When presented with a motion to dismiss on the ground that the complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), the district court must accept as true the well-pleaded factual allegations contained in the complaint, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 2064 (2010). Although "detailed factual allegations" are not necessary to withstand a motion to dismiss for failure to state a claim, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. The plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Id.* at 1950. When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.*

# IV.  DISCUSSION

Plaintiffs assert a total of four claims in this action, each of which is a challenge—in one way or another—to the BLM's March 25, 2010 decision to authorize the leasing of the West Antelope II tracts for prospective coal mining operations.  Only one of those four claims is the subject of the instant motions—the first.  Due in large part to Plaintiffs' opaque reasoning, the contours of that claim are not readily susceptible to precise definition, and the parties have unsurprisingly offered conflicting characterizations of the claim.  As explained in greater detail below, the Court credits Defendants' characterization of the claim, which leads ineluctably to the conclusion that the claim is time-barred.  However, even crediting Plaintiffs' characterization of their claim, Plaintiffs fail to state a plausible claim for relief.

## A.    *Plaintiffs' First Claim for Relief is an Untimely Collateral Attack on the BLM's January 1990 Decision to Decertify the Powder River Coal Production Region*

The dispute presents at the outset a question of framing—specifically, whether Plaintiffs' first claim for relief should be construed as a collateral attack on the BLM's decision to decertify the Powder River Basin as a coal production region in January 1990—more than twenty years before the BLM decided to authorize the leasing of the West Antelope II tracts—or whether it should instead be seen as a challenge to the BLM's ongoing failure to "recertify" the Powder River Basin as a coal production region prior to approving the leasing of the West Antelope II tracts based upon the alleged increase in coal production within the Powder River Basin in the intervening two decades.  The question is an important one; if Plaintiffs' claim is properly construed as a challenge to the BLM's 1990 decertification decision, it would plainly be time-barred.  The Court therefore begins with a more fulsome discussion of the nature of the claim.

What is clear is that the claim rests to some extent on the provisions of the Administrative

10

Procedure Act (the "APA"), with Plaintiffs claiming that the BLM's decision to authorize the leasing of the West Antelope II tracts was "arbitrary and capricious and otherwise not in accordance with law," Suppl. Compl. ¶ 105, which the Court takes as a reference to the APA provision permitting a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Unfortunately, the picture begins to cloud as one proceeds from this starting point. Plaintiffs allege that the BLM's March 25, 2010 leasing decision was in error because the BLM approved the leasing of the West Antelope II tracts without first "recertifying" the entirety of the Powder River Basin as a coal production region. *See* Suppl. Compl. ¶¶ 98-105. While Plaintiffs concede, as they must, that the Powder River Basin was decertified as a coal production region over two decades before the BLM authorized the leasing of the West Antelope II tracts, and that the region was not certified as a coal production region at the time the BLM rendered its final leasing decision, Plaintiffs steadfastly maintain that they are not in fact challenging the BLM's decertification decision. Pls.' Opp'n at 10. Instead, Plaintiffs frame their claim as a challenge to the "[c]ontinuing decertification of the Powder River Basin," contending that "[g]iven the [current] levels of coal production in the Powder River Basin, and anticipated production levels for the West Antelope II leases, decertification is no longer appropriate." Suppl. Compl. ¶¶ 102, 105. Plaintiffs contend that the Powder River Basin should have been "recertified" as a coal production region prior to the authorization of the leasing of the West Antelope II tracts, which by extension would have required the BLM to evaluate the propriety of any leasing under the "competitive regional leasing" process that applies within coal production regions, as opposed to the "leasing-by-application process" that applies outside coal production

regions. From this premise, Plaintiffs argue that the BLM "improperly authorized" the leasing of the West Antelope II tracts under the leasing-by-application process. *Id.* ¶ 104.

Defendants persuasively rejoin that Plaintiffs' first claim for relief is—at its core—a thinly veiled challenge to the BLM's 1990 decertification decision, because it was that decision that prescribed the specific leasing process that the BLM would apply to administer its federal coal leasing program in the Powder River Basin from that point forward. Significantly, this conclusion necessarily flows from the limitations imposed on the scope of judicial review of agency action. Under the APA, the reviewing court is generally confined to evaluating "final agency action," 5 U.S.C. § 704, which may include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13). As the United States Supreme Court has observed, all of these enumerated categories implicate "circumscribed, discrete agency actions," a limitation designed in large part "to protect agencies from undue interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 & 66 (2004). But Plaintiffs' first claim for relief is less a challenge to a discrete action taken by the BLM than a challenge to the BLM's broader policy decision to phase out coal production regions—and, in particular, the Powder River Coal Production Region—and to conduct its federal coal leasing program pursuant to the leasing-by-application process going forward. Critically, that policy decision was announced in January 1990, when the BLM decertified the Powder River Coal Production Region and thereby displaced the competitive regional leasing process with the leasing-by-application process in that area. *See* Decertification of the Powder River Coal Production Region, 55 Fed. Reg. 784 (Jan. 9, 1990). It was that decision—and none

other—that defined the process by which federal coal leasing was to occur in the Powder River Basin from that point onward absent further agency action.[4]  Because any cause of action pertaining to that agency action began to accrue on the date the action was taken—January 9, 1990—Plaintiffs' challenge is untimely because "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).

While not dispositive, the Court is mindful that this six-year limitations period must be "strictly construed" in favor of the United States.  *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987).  In this case, were Plaintiffs' proffered theory to prevail, it might very well have the effect of vitiating the essential function of the limitations period—to provide repose when parties elect not to act upon their legal rights in a timely manner.  In particular, Plaintiffs' theory would require federal agencies to constantly reevaluate and defend their past policy decisions in perpetuity, even in the absence of a mandatory statutory or regulatory duty to do so, whenever they take some action that somehow pertains to or relies upon those past decisions. Simply put, this "theory cannot hold water because . . . it would thwart statutes of limitations by allowing for instant revival of challenges to decades-old agency actions, and because it would open the door for the kind of programmatic challenges courts cannot hear, simply by treating an

---

[4]  Viewed from a slightly different perspective, the BLM's 1990 decertification decision "mark[ed] the consummation of [the BLM's] decisionmaking process" and constitutes the agency decision from which "rights and obligations [were] to be determined."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Despite Plaintiffs' consistent attempts to draw the attention elsewhere, "[w]hen an agency has employed a formal procedure . . . to announce a major policy decision not to regulate certain conduct, courts can use this procedure as 'a focal point for judicial review.'"  *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 171 (D.D.C. 2000) (quoting *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988)).

agency's 'adoption' of an existing program as discrete agency action." *Friends of The Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 26 (D.D.C. 2007). Notably, such a conclusion hardly leaves Plaintiffs without a remedy. To the extent they believed that the "continued decertification" of the Powder River Basin was no longer appropriate, Plaintiffs were free to petition the BLM to "recertify" the Powder River Basin as a coal production region at any point in the past two decades. In fact, Plaintiffs eventually did precisely that, and their petition for "recertification" is now the subject of a separate civil action pending before this Court. *See* Compl., *Wildearth Guardians v. Salazar*, No. 11 Civ. 670 (CKK) (D.D.C. Apr. 4, 2011), ECF No. [1].

In sum, the Court construes Plaintiffs' first claim for relief as a challenge to the BLM's decertification decision, and construed as such, the claim is untimely and must be dismissed.

B. **Plaintiffs Fail to State a Plausible Claim for Relief Based on the BLM's Alleged Failure to "Recertify" the Powder River Basin**

Even crediting Plaintiffs' characterization of their first claim for relief as a putative challenge to the BLM's ongoing failure to "recertify" the Powder River Basin at some unspecified point in time prior to authorizing the leasing of the West Antelope II tracts, the same result would obtain. For at least two reasons, Plaintiffs simply fail to state a plausible claim for relief. First, the essential premise to such a claim—that the BLM was somehow *required* to recertify the Powder River Basin—is without legal support. Second, even assuming, *arguendo*, that the BLM was subject to an abstract obligation to establish *some* coal production regions at *some* point in time, the question of when and where to establish coal production regions is a matter that has been committed to the BLM's discretion by law and lies beyond the ambit of judicial review. Both grounds for dismissal turn on the conclusion that the relevant statutory and

regulatory framework neither requires the BLM to establish specific coal production regions nor provides a meaningful standard to adjudge the BLM's exercise of its discretion in this field.

### 1. The Relevant Statutory and Regulatory Framework Does Not Require the BLM to Establish Coal Production Regions

In their first claim for relief, Plaintiffs purport to challenge the BLM's March 25, 2010 decision to authorize the leasing of the West Antelope II tracts through the leasing-by-application process. There are three important matters that are undisputed about the circumstances surrounding the BLM's leasing decision. First, it is undisputed that the BLM authorized the leasing of the West Antelope II tracts pursuant to the "leasing-by-application" process. Second, it is undisputed that the West Antelope II tracts were not within a "coal production region," as that term is used in 43 C.F.R. § 3400.5, at the time the BLM rendered its decision.[5] Third, it is undisputed that the BLM's coal leasing regulations provide that the "competitive regional leasing" process applies within coal production regions—and only within coal production regions—while the "leasing-by-application" process applies outside coal production regions. *See generally* 43 C.F.R. pt. 3420.

All this leads to an important conclusion—one that is not contested by the parties but nevertheless warrants mentioning here. Because the competitive regional leasing process only applies in coal production regions and because the West Antelope II tracts were indisputably not within a coal production region at the time the BLM rendered its decision, Plaintiffs' first claim for relief necessarily hinges on the premise that the BLM was somehow required to recertify the

---

[5] Indeed, the Powder River Coal Production Region, which would have encompassed the West Antelope II tracts had it survived, had not been certified as a coal production region for over twenty years. *See* Decertification of the Powder River Coal Production Region, 55 Fed. Reg. 784 (Jan. 9, 1990).

Powder River Basin as a coal production region before it authorized the leasing of the West Antelope II tracts. Indeed, had the BLM hypothetically sought to lease the West Antelope II tracts pursuant to the competitive regional leasing process without first recertifying the area as a coal production region, its decision would clearly have run counter to its own coal leasing regulations, as the competitive regional leasing process is by definition confined to coal production regions. *See generally* 43 C.F.R. pt. 3420. And so, in order to state a plausible claim for relief, Plaintiffs must show that the BLM was required to recertify the Powder River Basin as a coal production region before it authorized the leasing of the West Antelope II tracts.

The logical next question is what could be the source of the alleged obligation. Despite having ample opportunity to do so, Plaintiffs have failed to answer that question. Simply put, no such obligation emanates from the Mineral Leasing Act of 1920, the BLM's coal leasing regulations, or the BLM's formal or informal policy statements and pronouncements. The Court shall address each of these potential sources in turn.

### i. The Mineral Leasing Act of 1920

While Plaintiffs wisely disclaim any reliance upon the terms of the Mineral Leasing Act of 1920 to support their claim, the Act is not, as they inexplicably suggest, completely "inapposite" to the viability of their claim. Pls.' Opp'n at 6. The Court takes note of the fact that the Act makes no mention of coal production regions, the competitive regional leasing process, or the leasing-by-application process. Instead, Congress simply conferred upon the Secretary the broad authority "to divide any lands . . . which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest," and vested him with the "discretion, upon the request of any qualified applicant or on his own motion, from time to time,

[to] offer such lands for leasing and [to] award leases thereon on competitive bidding."[6]  30 U.S.C. § 201(a)(1).  Rather than defining the precise contours of the competitive leasing process, Congress elected to confer upon the Secretary "sweeping authority" to promulgate regulations in this area, *Indep. Petroleum Ass'n of Am.*, 279 F.3d at 1040, expressly authorizing him to "prescribe [any and all] necessary and proper rules and regulations" to discharge his discretion, 30 U.S.C. § 189.  In other words, the Act simply has nothing to say about certifying, decertifying, or recertifying coal production regions.  While this congressional silence is not the end of the matter, it is nonetheless relevant in asking whether the BLM was under an obligation to recertify the Powder River Basin as a coal production region before it authorized the leasing of the West Antelope II tracts.  The statute itself imposed no such obligation on the BLM.

### ii.        The BLM's Coal Leasing Regulations

Recognizing that no mandatory obligation can be found in the Act itself, Plaintiffs purport to rely on the BLM's coal leasing regulations, suggesting that the BLM has somehow "failed to comply with its own leasing regulations" by failing to recertify the Powder River Basin prior to authorizing the leasing of the West Antelope II tracts.  Pls.' Opp'n at 6.  The argument is without merit.  While agencies may certainly be bound by the terms of their own regulations, the two provisions relied upon by Plaintiffs—43 C.F.R. §§ 3400.5, 3420.0-2—simply do not impose upon the BLM any obligation to certify, decertify, or recertify coal production regions nor provide any guidance as to whether, when, and where coal production regions should be established.  The first cited provision merely authorizes the BLM to alter or change the

---

[6] As described above, both the competitive regional leasing process and the leasing-by-application process are forms of competitive leasing.  *See supra* Part I.

boundaries of coal production regions by publication of a notice in the Federal Register.[7]  43

C.F.R. § 3400.5.  The second cited provision merely sets forth the overarching objectives of the

coal leasing regulations.[8]  *Id.* § 3420.0-2.  Neither provision can be read as cabining the BLM's

discretion to certify, decertify, or recertify coal production regions as it sees fit in an exercise of

---

[7]  The provision provides, in full, as follows:

> The Bureau of Land Management shall establish by publication in the
> Federal Register coal production regions.  A coal production region
> may be changed or its boundaries altered by publication of a notice of
> change in the Federal Register.  Coal production regions shall be used
> for establishing regional leasing levels under § 3420.2 of this title.
> Coal production regions shall be used to establish areas in which
> leasing shall be conducted under § 3420.3 of this title and for other
> purposes of the coal management program.

43 C.F.R. § 3400.5.  The BLM does not interpret this provision as cabining its discretion to
establish coal production regions as it sees fit but rather sees it as prescribing the requisite
procedure to be followed when it elects to exercise that discretion—namely, publication in the
Federal Register.  Because the BLM is the agency charged with administering the regulations, its
interpretation is entitled to deference.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512
(1994) (agency's interpretation of its own regulation must be given controlling weight unless
plainly erroneous or inconsistent with the regulation).  The BLM's proffered interpretation is
reasonable; indeed, the Court would adopt the same interpretation were it presented with the
question *de novo*.

[8]  The provision provides, in full, as follows:

> The objectives of these regulations are to establish policies and
> procedures for considering development of coal deposits through a
> leasing system involving land use planning and environmental
> assessment or environmental impact statement processes; to promote
> the timely and orderly development of publicly owned coal resources;
> to ensure that coal deposits are leased at their fair market value; and
> to ensure that coal deposits are developed in consultation, cooperation
> and coordination with the public, state and local governments, Indian
> tribes and involved Federal agencies.

43 C.F.R. § 3420.0-2.

its discretion,  nor as providing any guidance as to whether, when, and where coal production regions should be established.

In an attempt to evade this conclusion, Plaintiffs speculate that the BLM simply "must have" intended to have a competitive regional leasing program on an ongoing basis or else the regulations governing that process would be "entirely superfluous." Pls.' Opp'n at 7.  There are several reasons why this argument is unavailing, but the Court will only mention two.  First, the BLM indisputably did maintain a competitive regional leasing program for over a decade, meaning that the regulations plainly were not "superfluous" at that time.  What Plaintiffs appear to be suggesting is that the BLM was somehow obligated to rescind the regulations once they were no longer in active use, but they cite no legal support for the proposition and the Court is aware of none.  Second, and in a similar vein, the BLM has never foreclosed the possibility that it might create new coal production regions sometime in the future.  Should it elect to do so, the regulations would clearly serve a renewed purpose at that time, and not be, as Plaintiffs suggest, "superfluous."  In the final analysis, Plaintiffs' arguments fall woefully short of transforming the BLM's coal leasing regulations into a mandatory obligation to create coal production regions.

### iii.    The BLM's Statements and Pronouncements

With these avenues foreclosed, Plaintiffs next turn to a handful of statements and pronouncements made by the BLM over the years with the basic aim of suggesting that the BLM is required to establish coal production regions wherever significant coal production may be expected to occur.  Pls.' Opp'n at 8.  True, "[i]t is well settled that an agency, even one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987).  However, the question that

remains is whether the statements relied upon by Plaintiffs "create *binding norms* by imposing rights or obligations on the respective parties." *Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 638 (D.C. Cir. 2003) (emphasis in original). Generally speaking, "an agency pronouncement is transformed into a binding norm if the statement's language, context, and available extrinsic evidence indicate the agency so intended." *Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States*, 516 F. Supp. 2d 43, 58 (D.D.C. 2007) (internal quotation marks omitted). Where, as here, the pronouncements impose no significant restraints on the agency's discretion, they cannot be regarded as binding norms. *Padula*, 822 F.2d at 100.

Plaintiffs first rely upon a particular phrase used by the BLM in the notice of final rulemaking that it published in the Federal Register when first enacting its coal leasing regulations in 1979—namely, the "normal leasing process." *See* Final Rulemaking, 44 Fed. Reg. 42,584, 42,594 (July 19, 1979). Specifically, Plaintiffs suggest that the "agency repeatedly referred to the Competitive [Regional] Leasing Program as 'the normal leasing process' for federal coal." Pls.' Opp'n at 7. As a threshold matter, Plaintiffs' argument fails at the outset because it rests on a strained and untenable reading of the BLM's notice of final rulemaking. In proffering their interpretation, Plaintiffs elide the fact that the leasing-by-application process applies not just in "areas outside coal production regions," but also within coal production regions "where an emergency need for unleased coal deposits is demonstrated." 43 C.F.R. §§ 3425.0-2, 3425.1-5. Here, the language in the notice of final rulemaking that is relied upon by Plaintiffs at most suggests that the BLM intended the competitive regional leasing process to be the default leasing process *within* coal production regions. That is, the cited language speaks to a concern that the "emergency need" exception to the competitive regional leasing process be

appropriately circumscribed.  It does not suggest that the leasing-by-application process was to be the exception to the rule.  Regardless, even crediting Plaintiffs' interpretation, mere passing references to a certain process as "normal" in a notice of rulemaking hardly creates the sort of "binding norm" that could support their first claim for relief.  There simply is no indication—none—that the BLM intended to cabin its discretion to certify, decertify, and recertify coal production regions or to prioritize the competitive regional application process over the leasing-for-application process.

The same holds true for the BLM's statement—made in the context of delineating the boundaries of coal production regions in 1979—that it included counties within the designated regions within which "substantial [coal] production may occur."  Identification of Coal Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. at 65,197.  Rather than cabining the scope of the BLM's discretion to certify, decertify, or recertify coal production regions, the statement actually reinforces that discretion.  In the cited language, the BLM was explaining that "subsequent boundary changes can be made to any of the coal production regions set out in this notice."  *Id.*  That the BLM identified as one of the factors in its decision the level of coal production in the areas at issue is hardly remarkable—it would be a strange thing indeed if the BLM decided to create a coal production region in an area without meaningful levels of coal production.  But in making the statement, the BLM did not impose upon itself a "binding norm" to certify, decertify, or recertify coal production regions or to limit the factors it could consider in exercising its discretion.

Nor did the BLM cabin the scope of its broad discretion when it fleshed out the reasons behind its decision to create certain coal production regions.  The notice published in the Federal

Register included the following statement concerning the basis for the BLM's decision to establish the various coal production regions:

> In delineating the coal production regions set out in this notice, the Department has considered the following factors: 1. Similarity in type and situation of coal; 2. General transportation and markets; 3. Broad economic and social-cultural similarities; 4. Administrative efficiency; and 5. Presence of federal leases, preference right lease applications, and other indications of industry interest in Federal coal.

Identification of Coal Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. at 65,196. But this is merely the explanation for the agency's reasoned decision. It too does not evince any intention on the BLM's part to create a "binding norm" governing future agency decisionmaking. The agency did not purport to limit the factors that it might consider when certifying, decertifying, or recertifying coal production regions in the future, nor can it be read as requiring the BLM to create coal production regions in specific areas. What Plaintiffs would essentially have this Court conclude is that whenever an agency attempts to articulate the reasoning behind a decision entrusted to its discretion by law, it cabins its discretion to depart from that reasoning down the road and freezes its decisionmaking in time. But this is not the law—the language and context of the agency's pronouncement must evince an intent to be bound thereby. No such intent exists here.

In the final analysis, Plaintiffs have failed to point this Court to any legal authority that could conceivably serve as a basis for concluding that the BLM was *required* to recertify the Powder River Basin before authorizing the leasing of the West Antelope II tracts. *See Alliance to Save Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 5 (D.D.C. 2007) (dismissal appropriate where plaintiff "identified no nondiscretionary duty that [the agency] has failed to perform."). Congress expressly conferred upon the Secretary the discretion to offer public lands

for coal leasing, and left it to the agency to articulate the process and procedure that it considered necessary and proper to carry out the statutory command to lease such lands upon competitive bidding. *See* 30 U.S.C. §§ 189, 201(a)(1). In enacting the contemplated regulations pursuant to the authority conferred upon it by Congress, the BLM created two competitive leasing processes—one applying within coal production regions and a second applying largely outside coal production regions. *See generally* 43 C.F.R. pt. 3420. Those regulations articulated the procedure to be used when creating coal production regions—notice in the Federal Register—but neither required the creation of coal production regions nor specified when and where the creation of coal production regions might be appropriate. *See* 43 C.F.R. § 3400.5. When it first certified various coal production regions, the BLM made a variety of statements explaining the basis for its decision, none of which can be construed as cabining its discretion to decide whether, when, and where to create coal production regions. Without a mandatory obligation to create coal production regions at all, let alone coal production regions in specific areas or under certain circumstances, Plaintiffs' first claim for relief—which hinges on the premise that the BLM was somehow required to recertify the Powder River Basin as a coal production region before it authorized the leasing of the West Antelope II tracts—fails to state a plausible claim for relief and must be dismissed.

>    **2.    The Relevant Statutory and Regulatory Framework Does Not Provide a Judicially Manageable Standard**

Even assuming, *arguendo*, that the BLM was subject to an abstract obligation to establish *some* coal production regions at *some* point in time, the question of when and where to establish coal production regions is a matter that has been committed to the BLM's discretion by law and lies beyond the ambit of judicial review. It is axiomatic that judicial review cannot extend to

"agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In order for the district court to exercise its judicial function, there must be "law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). In recognition of this sensible principle, judicial review will not lie where the governing statute and regulations are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). In the instant case, Plaintiffs readily concede that neither the Act nor the BLM's coal leasing regulations "contain absolute, bright-line criteria for defining a Coal Production Region." Pls.' Opp'n at 8. But the concession is a radical understatement—neither contains *any* criteria for defining a coal production region. *See* 30 U.S.C. § 201(a)(1); 43 C.F.R. § 3400.5.

In the face of this statutory and regulatory silence, Plaintiffs suggest that "substantial coal production" provides a meaningful standard against which to adjudge the BLM's exercise of its discretion, language that it pulls from statements made by the BLM in the course of certifying and decertifying the Powder River Basin, none of which created binding norms governing future conduct. *See, e.g.*, Identification of Coal Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. at 65,197 (noting that additional counties could be added to coal production regions "if future circumstances indicate that substantial production may occur from these counties."). True, "judicially manageable standards 'may be found in formal and informal policy statements.'" *Steenholdt*, 314 F.3d at 638 (quoting *Padula*, 822 F.2d at 100). But even assuming that "substantial coal production" could constitute a judicially manageable standard,[9]

_____

[9] Such an assumption would be of questionable soundness. Notably, while Plaintiffs proffer a litany of statistics concerning the increasing levels of coal production in the Powder River Basin since decertification, they have not even attempted to point to a specific point in time

the agency documents upon which Plaintiffs rely do not suggest that the BLM has ever relied

upon the magnitude of coal production to the exclusion of other relevant factors when certifying

and decertifying coal production regions.  Indeed, they suggest the opposite.  In the notice

published in the Federal Register when the BLM first established coal production regions in

1979, the BLM explained that it considered a variety of factors, including "[s]imilarity in type

and situation of coal," "[g]eneral transportation and markets," "[b]road economic and social-

cultural similarities," "[a]dministrative efficiency," and "[p]resence of federal leases, preference

right lease applications, and other indications of industry interest."  Identification of Coal

Production Regions Having Major Federal Coal Interests, 44 Fed. Reg. at 65,196.  Similarly,

when proposing the decertification of the Powder River Coal Production Region in 1989, the

BLM cited such factors as "limited leasing interest in the region, soft market conditions for the

foreseeable future," and "administrative efficiency."  Proposed Decertification of All or a Portion

of the Powder River Basin, 54 Fed. Reg. at 6,339-6,400.  Even assuming these factors constitute

a closed set, they still do not provide a judicially manageable standard of review.  Federal courts

simply are not equipped to evaluate such considerations as "broad economic and social cultural

similarities" or to decide what would best serve "administrative efficiency."  Indeed, the

generality and breadth with which these factors are stated only further evinces that they were not

intended to cabin the discretion committed to the BLM to establish coal productions regions

when and where it sees fit.  Therefore, even assuming, *arguendo*, that the BLM was required to

establish some coal production regions, a review of the pertinent statutory and regulatory

---

when the levels of coal production allegedly became so "substantial" as to require recertification
of the area, further suggesting that the proffered standard does not provide a judicially
manageable standard of review.

framework demonstrates that the question of when and where to establish coal production regions is a matter that has been committed to the BLM's discretion by law and therefore lies beyond the ambit of judicial review.

## V. CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit. Therefore, and for the reasons stated above, the Court shall grant the Defendant-Intervenors' [52] Motion for Partial Judgment on the Pleadings and the Federal Defendants' [53] Motion for Partial Judgment on the Pleadings. An appropriate order accompanies this memorandum opinion.


Date: May 8, 2011

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge
