**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

WILDEARTH GUARDIANS, *et al.*,

        Plaintiffs,

    v.

KEN SALAZAR, Secretary, U.S. Department
of the Interior, *et al.*,

        Defendants, and

ANTELOPE COAL LLC, *et al.*,

        Defendant-Intervenors.

Civil Action No. 10-01174 (CKK)
Civil Action No. 11-00037 (CKK)

---

**MEMORANDUM OPINION**
(July 30, 2012)

    Plaintiffs[1] bring these consolidated actions challenging the United States Bureau of Land

Management's decision to authorize the leasing of certain public lands in northeastern Wyoming

for coal mining operations. Before the Court is a series of cross-motions for summary judgment.

Upon careful consideration of the parties' submissions, the relevant authorities, and the record as

a whole, Plaintiffs' [70, 71] Motions for Summary Judgment shall be DENIED and Defendants'

[74, 75, 79] Cross-Motions for Summary Judgment shall be GRANTED.[2]

---

[1] A glossary of terms appears immediately below.

[2] The Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f). Furthermore, while the Court bases its decision on the entire record, its consideration has focused on the parties' memoranda and the joint appendix. *See* ECF Nos. [70-1, 71, 74, 75, 76, 79-1, 84, 86, 89, 90, 91, 92, 94, 96]. When citing to memoranda or other papers, the Court shall simply identify the party and docket number and provide a brief document descriptor (*e.g.*, "WildEarth Pls.' [71] Mem.").

# I. GLOSSARY

| | |
|---|---|
| **BLM** | United States Bureau of Land Management |
| **Defendants** | Federal Defendants and Intervenors |
| **EIS** | Environmental Impact Statement |
| **EPA** | United States Environmental Protection Agency |
| **ESA** | Endangered Species Act |
| **Federal Defendants** | BLM and FWS |
| **FLPMA** | Federal Land Policy and Management Act |
| **FWS** | United States Fish and Wildlife Service |
| **GHG** | Greenhouse gas |
| **Intervenors** | Antelope Coal LLC, National Mining Association, and State of Wyoming |
| **NAAQS** | National Ambient Air Quality Standard |
| **NEPA** | National Environmental Policy Act |
| **NO$_2$** | Nitrogen dioxide |
| **NO$_x$** | Nitrogen oxide |
| **Plaintiffs** | WildEarth Plaintiffs and PRBRC |
| **PM$_{10}$** | Particulate matter |
| **PRB** | Powder River Basin |
| **PRBRC** | Powder River Basin Resource Council |
| **ROD** | Record of Decision |
| **WAII Tracts** | West Antelope II tracts |
| **WildEarth Plaintiffs** | WildEarth Guardians, Defenders of Wildlife, and Sierra Club |

# II. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth the factual and procedural background of the case. *See WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61 (D.D.C. 2011); *WildEarth Guardians v. Salazar*, 272 F.R.D. 4 (D.D.C 2010).

\* \* \*

2

Under the Mineral Leasing Act of 1920, BLM is permitted to lease public lands for coal mining operations upon conducting a competitive bidding process. *See* 30 U.S.C. §§ 181, 201(a)(1). On April 6, 2005, Antelope Coal LLC filed an application with BLM requesting that certain public lands adjacent to its pre-existing mining operations in Campbell and Converse Counties, Wyoming be offered up for competitive lease sale to interested parties. *See* J.A. 168-98, 926. The new lands, referred to herein as the WAII tracts, consist of approximately 4,109 acres containing approximately 429.7 million tons of in-place federal coal. *See* J.A. 926.

On October 17, 2006, after conferring with the State of Wyoming and the Powder River Regional Coal Team, BLM published a notice of its intention to prepare an EIS for leasing the WAII tracts. *See* NOTICE OF INTENT (NOI) TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT (EIS), 71 Fed. Reg. 61064 (Oct. 17, 2006). On November 1, 2006, BLM held a "scoping" meeting to preliminarily identify the issues to be addressed in the agency's environmental analysis. *See* J.A. 8-9. On February 8, 2008, EPA published BLM's draft EIS and solicited public comment. *See* WEEKLY RECEIPT OF ENVIRONMENTAL IMPACT STATEMENTS, 73 Fed. Reg. 7555 (Feb. 8, 2008). On March 24, 2008, BLM held another public hearing to receive comments on the draft EIS. *See* J.A. 1637, 1683. During the sixty-day comment period, three individuals testified and fourteen individuals and organizations submitted written comments. *See* J.A. 899, 1637, 1683.

BLM then prepared a final EIS spanning over 700 pages and published a notice of its availability on January 23, 2009. *See* J.A. 901-1637; NOTICE OF AVAILABILITY OF FINAL ENVIRONMENTAL IMPACT STATEMENT, 74 Fed. Reg. 4228 (Jan. 23, 2009). In the final EIS, BLM reprinted and responded to the comments received on the draft EIS. *See* J.A. 1545-1637. The final EIS also included a biological assessment designed to ascertain whether leasing the WAII

tracts for coal mining operations would negatively affect listed species or critical habitat.  *See* J.A. 1512-43.  FWS, as the relevant consulting agency, concurred in writing with BLM's underlying determination.  *See* J.A. 33-34.

Subsequently, BLM held a thirty-day public comment period on the final EIS and published written responses to the comments received.  *See* J.A. 1638-69.  On March 25, 2010, in a 44-page ROD, BLM formally decided to divide the lands into two tracts and to offer each tract for lease at separate, competitive sealed-bid sales.  *See* J.A. 1670-1714.  On April 1, 2010, BLM published a notice of the availability of the ROD.  *See* Notice of Availability of the Record of Decision, 74 Fed. Reg. 16502 (Apr. 1, 2010).

## III.  LEGAL STANDARD

Under the "arbitrary or capricious" standard, which the parties agree applies to the Court's review, the reviewing court must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The party challenging the agency action bears the burden of proof.  *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002)).  In assessing the merits of the plaintiff's challenge, the district court begins with the presumption that the agency's action was valid.  *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir.), *cert. denied*, 537 U.S. 815 (2002).

Agency action must generally be affirmed on the grounds originally stated by the agency; a reviewing court may not attempt to supply "a reasoned basis for the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Nor may counsel's "*post hoc* rationalizations," offered for the first time on judicial review, substitute for an agency's obligation to articulate a valid

rationale in the first instance. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1276 (D.C. Cir. 2005). Consistent with these principles, judicial review is typically confined to the administrative record before the agency at the time the decision was made. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

In order to avoid a finding that the challenged agency action was arbitrary or capricious, the "agency must [have] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted). In articulating the reason for its action, the agency "must have provided a 'rational connection between the facts found and the choice made.'" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). An agency's decision may be said to be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *accord Jicarilla Apache Nation v. DOI*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). That is, it is not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to

uphold the decision. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). At bottom, the reviewing court is not entitled to substitute its judgment for that of the agency. *Overton Park*, 401 U.S. at 416.

In evaluating agency action under the "arbitrary or capricious" standard, the reviewing court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Just as the burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action, so too must that party establish that the errors ascribed were prejudicial. *Jicarilla Apache Nation*, 613 F.3d at 1121 (citing *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)). The question of whether an error was prejudicial is necessarily contextual, and courts must proceed with a case-specific application based upon an examination of the entire record. *Jicarilla Apache Nation*, 613 F.3d at 1121. However, where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings. *Id.*

## IV. DISCUSSION

The Court's discussion here proceeds in two stages. The Court first addresses Plaintiffs' standing and defines the scope of this action. *See infra* Part IV.A. Thereafter, the Court addresses the merits of Plaintiffs' remaining claims. *See infra* Part IV.B-D.

A.     *Plaintiffs' Standing and the Scope of this Action*

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "In order to establish the

existence of a case or controversy within the meaning of Article III, [a] party must meet certain

constitutional mimima," including "the requirement that . . . it has standing to bring the action."

*Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002).  The "irreducible constitutional minimum"

of standing requires: (1) an injury in fact; (2) causation; and (3) redressability.  *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Where, as here, a party's standing is not

self-evident, the basis for standing must be set forth in the party's opening brief, supported by

any necessary affidavits or other evidence.  *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir.

2002).  The district court must assume the merits of the plaintiff's legal claim.  *Parker v. District

of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*,

554 U.S. 570 (2008).

 In this case, Plaintiffs' overarching assertion that BLM failed to prepare an adequate EIS

before authorizing the leasing of the WAII tracts presents the sort of procedural injury that gives

rise to a somewhat relaxed standing inquiry.[3]  *Cf. Nat'l Parks Conservation Ass'n v. Manson*,

414 F.3d 1, 5 (D.C. Cir. 2005) (describing "an agency's failure to prepare a statutorily required

environmental impact statement before taking action with potential adverse consequences to the

environment" as "the archetypal procedural injury").  A plaintiff with "a procedural right . . . can

assert that right without meeting all the normal standards for redressability and immediacy."

*Lujan*, 504 U.S. at 573 n.7.  In particular, a procedural-rights plaintiff "never has to prove that if

[it] had received the procedure the substantive result would have been altered.  All that is

necessary is to show that the procedural step was connected to the substantive result."  *Sugar

Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

---

[3]  Contrary to Defendants' assertion, Plaintiffs identify procedural harm as a basis for their
standing in their opening briefs.

But while the normal standards of redressability and immediacy are relaxed in this context, the requirements of injury in fact and causation are not. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Because "injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute," *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009), a plaintiff must always identify an "injury to [a] concrete, particularized interest," *Ctr. for Law & Educ.*, 396 F.3d at 1157; *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Furthermore, and more critically for present purposes, a procedural-rights plaintiff must still show that the claimed injury is "fairly traceable" to the defendant's procedural breach. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Specifically, the "plaintiff must show . . . that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (*en banc*).

Plaintiffs' claims in this case divide into two basic categories: (1) those relating to climate change impacts that would allegedly result from the release of GHGs during coal mining operations at the WAII tracts (and other proposed coal lease tracts in the PRB) or from the eventual combustion of coal mined from those tracts; and (2) those unrelated to climate change impacts. The Court finds that Plaintiffs have standing to raise only the latter category of claims.

       1.    <u>Climate Change Impacts</u>

Plaintiffs aver that their members have recreational, aesthetic, and economic interests in the areas adjacent to the WAII tracts.[4] It is by now well established that such interests can support an injury in fact. *See, e.g.*, *Summers*, 555 U.S. at 494 ("While generalized harm to . . .

---

[4] One member also claims to have recreational and aesthetic interests in the "American West" and the "Rocky Mountain region." The Court's analysis applies equally to those interests.

the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  Nonetheless, a plaintiff must still show that the alleged injuries to its aesthetic, recreational, and economic interests are "fairly traceable" to the agency action at issue.  *Allen*, 468 U.S. at 751.  Specifically, "an adequate causal chain must contain at least two links: one connecting the [] EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury.  * * * The second link addresses what often proves the more critical causation question in this type of case," *Fla. Audubon*, 94 F.3d at 668, and it is here where Plaintiffs' theory of standing falters.

On the subject of climate change impacts, WildEarth Plaintiffs contend that they have standing because their members are concerned that the development of the WAII tracts will result in climate change impacts that "will negatively impact their ability to enjoy these places," such as "greater drought conditions; increased invasive species and insect infestations; increased fire frequency, severity, and extent; and a concordant reduction in biodiversity and sensitive species."  WildEarth Pls.' [70] Mem. at 7-8 (internal citations omitted) (citing Decl. of Jeremy Nichols, ECF No. [71-1], ¶¶ 24-27, 35-37, 38, 40, 58; Decl. of Jonathan Proctor, ECF No. [71-2], ¶¶ 7-9).  In a similar vein, PRBRC claims that one of its members "believes" that climate change "will exacerbate water production problems" near his ranch "by reducing available snowpack that feeds springs and streams and increasing seasonal temperatures resulting in a

longer, more intense irrigation season." PRBRC's [70-1] Mem. at 5-6 (internal quotation marks and citations omitted) (citing J.A. 2583-84 (Decl. of Dave Clarendon) ¶¶ 5-10, 12).

The fundamental problem with this theory of standing lies in the disconnect between Plaintiffs' recreational, aesthetic, and economic interests, which are uniformly local, and the diffuse and unpredictable effects of GHG emissions. Other courts besides this one have noted the difficulties that arise when a plaintiff claims that its localized interests will be affected by agency action that supposedly contributes to GHG emissions. *See, e.g.*, *Amigos Bravos v. BLM*, 816 F. Supp. 2d 1118, 1129 (D.N.M. 2011) ("[W]hile there may be a generally accepted scientific consensus with regard to global climate change, there is not the same consensus with regard to what the specific effects of climate change will be on individual geographic areas."); *Sierra Club v. U.S. Def. Energy Support Ctr.*, Civil Action No. 01:11-cv-41, 2011 WL 3321296, at *4 (E.D. Va. July 29, 2011) ("A reduction of greenhouse gas emissions in one area or from one source has no effect on greenhouse gas levels that are specific to that area, and may even have no effect on global greenhouse gas levels . . . .") (citing PREVENTION OF SIGNIFICANT DETERIORATION AND TITLE V GREENHOUSE GAS TAILORING RULE, 75 Fed. Reg. 31514, 31529 (June 3, 2010)). True, the mere fact that GHG emissions "inflict widespread harm" does not present an "insuperable jurisdictional obstacle" to standing, *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007), but a plaintiff must nonetheless present "evidence to suggest that [it is] adversely affected by global climate change," *Coal. for Responsible Regulation, Inc. v. EPA*, __ F.3d __, 2012 WL 2381955, at *36 (D.C. Cir. June 26, 2012) (*per curiam*). Because the environmental impacts of GHG emissions are diffuse and unpredictable, a plaintiff in this kind of case will often "have some difficulty" in establishing causation. *Fla. Audubon*, 94 F.3d at 666. However,

"that difficulty stems from the nature of the plaintiff's claim, which is premised on an alleged injury that is itself difficult to locate, not some flaw in the standard." *Id.*

In this case, Plaintiffs have not shown that the GHG emissions that would allegedly result from coal mining operations at the WAII tracts and other proposed coal lease tracts in the PRB, or from the eventual combustion of coal mined from those tracts, yield a "demonstrable increase in risk" to their recreational, aesthetic, and economic interests in the areas adjacent to the WAII tracts. *Id.* at 665. Plaintiffs point to studies suggesting that GHG emissions may lead to global or even broad regional climate change impacts, *see, e.g.*, J.A. 1285-87, but those studies do not establish a nexus between the anticipated GHG emissions from the leasing of WAII tracts and "injuries alleged in the specific geographic area[s] of concern," *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (*en banc*) (internal quotation marks and citation omitted). WildEarth Plaintiffs' assertion that "greenhouse gases emitted anywhere can exacerbate climate change everywhere" is no substitute for this showing. WildEarth Pls.' [89] Mem. at 6 (citing ENDANGERMENT AND CAUSE OR CONTRIBUTE FINDINGS FOR GREENHOUSE GASES UNDER SECTION 202(A) OF THE CLEAN AIR ACT, 74 Fed. Reg. 66496, 66538 (Dec. 15, 2009); EPA'S DENIAL OF THE PETITIONS TO RECONSIDER THE ENDANGERMENT AND CAUSE OR CONTRIBUTE FINDINGS FOR GREENHOUSE GASES UNDER SECTION 202(A) OF THE CLEAN AIR ACT, 75 Fed. Reg. 49556, 49557 (Aug. 13, 2010)). Nor can Plaintiffs rely upon the handful of assertions relating to causation by their members, *see, e.g.*, J.A. 2583-84, because those assertions are conclusory or are unaccompanied by sufficient information to permit the inference that the members are both competent to provide such testimony and are relying on facts that would admissible at trial. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration . . . must be made on personal knowledge, set out facts that would admissible in evidence, and show

that the affiant or declarant is competent to testify on the matters stated."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of this provision is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[A]n affidavit must set forth specific facts in order to have any probative value.") (citations omitted); *New York State Ophthalmological Soc. v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) (concluding that a party cannot create a genuine dispute of material fact by "offer[ing] only unsupported expert opinion"), *cert. denied*, 490 U.S. 1098 (1989).

Plaintiffs' failure to bridge the evidentiary gap between their localized interests and the diffuse and unpredictable effects of GHG emissions is particularly troubling because the relationship between those two things in this case depends on the behavior of countless third parties.  *See Fla. Audubon*, 94 F.3d at 670 ("The Supreme Court has itself noted the improbability of establishing the necessary likelihood of some result when that result depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation, especially when that group . . . is actually comprised of dozen of actors, each of whom must react to other market or regulatory inputs.") (citation omitted).  For example, there is evidence that even if the WAII tracts lay fallow, domestic and international consumers' consumption behavior would not be materially affected and the national energy portfolio would remain unchanged.  *See* J.A. 1678-79.  WildEarth Plaintiffs respond, without any meaningful evidentiary support, that a "basic economic principle" suggests that reduced supply would entail an increase in the price of coal.  WildEarth Pls.' [89] Mem. at 7.  But even assuming that the price of coal were to rise in the absence of coal from the WAII tracts, Plaintiffs do not point to any competent evidence to support their assertion that the price increase would be so significant that energy consumers

would substitute coal with energy sources with a "lesser or no carbon dioxide contribution," *id.*, let alone at a rate and in a manner that would help ameliorate the alleged climate change impacts identified by Plaintiffs.  And the market behavior of coal consumers is only one link in a long chain of assumptions, suppositions, and predictive judgments required to connect Plaintiffs' localized interests, the effects of global GHG emissions, and the leasing of the WAII tracts.  The causal chain proffered by Plaintiffs is ultimately too attenuated.[5]

In the final analysis, Plaintiffs have failed to show that the leasing of the WAII tracts will lead to climate change impacts resulting in specific adverse consequences to their articulated recreational, aesthetic, or economic interests in the discrete areas where they have concrete future plans to recreate, work, etc.  Accordingly, the Court concludes that Plaintiffs lack standing to pursue their climate change claims in this case.

---

[5]  *Cf. Ctr. for Biological Diversity v. DOI*, 563 F.3d 466, 478-79 (D.C. Cir. 2009) ("In order to reach the conclusion that Petitioners are injured because of Interior's alleged failure to consider the effects of climate change with respect to the Leasing Program, Petitioners must argue that: adoption of the Leasing program will bring about drilling; drilling, in turn, will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adversely affect the animals and their habitat; therefore Petitioners are injured by the adverse effects on the animals they enjoy."); *Fla. Audubon*, 94 F.3d at 669-70 ("For the tax credit to pose a substantial probability of a demonstrably increased risk of particularized environmental damage, the credit must prompt third-party fuel producers to undertake the acquisition of production facilities for ETBE and begin to produce ETBE in such quantities as to increase the demand for ethanol from which ETBE is derived.  This increased demand must then not simply displace existing markets for currently-produced ethanol, but in fact increase demand for the agricultural products from which ethanol is made.  Again, this demand must not be filled by existing corn or sugar supplies, but instead spur new production of these products by farmers, who must be shown to have increased production of these products at least to some measurable extent because of the tax credit . . . .  Moreover, any agricultural pollution from this increased production must be demonstrably more damaging than the pollution formerly caused by prior agricultural production or other prior use of land now cultivated because of the ETBE tax credit."); *see also Amigos* Bravos, 816 F. Supp. 2d at 1134-36; *Sierra Club*, 2011 WL 3321296, at *5.

2.      Non-Climate Change Impacts

Plaintiffs' remaining claims are based on the non-climate change impacts that will allegedly result from leasing the WAII tracts for coal mining operations.  Defendants do not dispute that Plaintiffs have standing to pursue these claims, and for good reason because these claims rest on the contention that coal mining operations at the WAII tracts will lead to increased air, water, and land pollution in the areas immediately adjacent to the WAII tracts—that is, in the specific areas where Plaintiffs' members recreate, and work.

For example, Plaintiffs allege that BLM's failure to take full stock of the environmental impacts of $NO_2$ emissions during mining operations will lead to haze, smog, and dust clouds in the areas immediately adjacent to the WAII tracts.  It is uncontested that $NO_2$ emissions contribute to these localized physical phenomena.  *See* J.A. 1047 ("Blasting that is done to remove the material overlying the coal (the overburden) can result in emissions of several products, including $NO_2$ . . . .  When this occurs, gaseous, orange-colored clouds may be formed and they can drift or be blown off mine permit areas.").  Such physical phenomena would directly affect Plaintiffs' members' enjoyment of these specific areas.

Considering the record as a whole, the Court finds that Plaintiffs have met their burden of showing that they have standing to pursue their claims based on non-climate change impacts.

*   *   *

In sum, the Court finds that Plaintiffs have standing to pursue their claims unrelated to climate change, but lack standing to pursue those claims relating to climate change impacts.  The Court confines its consideration of the merits accordingly.  *See Coal. for Responsible Regulation*, 2012 WL 2381955, at *11 ("Absent a petitioner with standing to challenge EPA's inclusion of PFCs and $SF_6$ in the 'air pollution' at issue, this court lacks jurisdiction to address the merits of

[the] contention."); *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 n* (D.C. Cir. 1999)

("[Petitioner] also contends that the agency failed to consider the interests of businesses owned

by women and members of minority groups . . . .  Because [Petitioner] makes no showing,

however, that any of its members is owned by a woman or member of a minority group, it lacks

standing to raise this argument.").

  B.  *Plaintiffs' Remaining NEPA Claims*

  NEPA requires an agency to "take a 'hard look' at the environmental effects of its

proposed action," *Theodore Roosevelt Conservation P'Ship v. Salazar*, 661 F.3d 66, 75 (D.C.

Cir. 2011)—typically through the preparation of an EIS.  *See Found. on Econ. Trends v. Heckler*,

756 F.2d 143, 146 (D.C. Cir. 1985) ("The major action-forcing provision of NEPA is the

requirement that all agencies of the Federal government prepare a detailed environmental

analysis for major Federal actions significantly affecting the quality of the human environment.")

(quotation marks and citations omitted).  In this regard, NEPA has twin aims.  "First, it places

upon an agency the obligation to consider every significant aspect of the environmental impact

of a proposed action."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S.

87, 97 (1983) (quotation marks and citation omitted).  "Second, it ensures that the agency will

inform the public that it has indeed considered environmental concerns in its decisionmaking

process."  *Id.*  Ultimately, the statute is designed to "ensure fully informed and well-considered

decisionmaking, but not necessarily the best decision."  *New York v. NRC*, 681 F.3d 471, 476

(D.C. Cir. 2012) (quotation marks and citation omitted); *see also Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than

unwise—agency action.").  Therefore, "[t]he focus of the 'hard look' doctrine is to ensure that

the agency has adequately considered and disclosed the environmental impact of its actions and

that its decision is not arbitrary or capricious." *Theodore Roosevelt Conservation*, 661 F.3d at 75

(quotation marks and citation omitted).

In this case, Plaintiffs claim that the final EIS prepared by BLM is inadequate for a

number of reasons. The Court addresses each reason in turn.

      1.    Ozone Emissions

WildEarth Plaintiffs first contend that BLM failed to analyze the impacts of ozone

emissions on local air quality. *See, e.g.*, WildEarth Pls.' [89] Mem. at 9 ("Plaintiffs' complaint

about the lack of ozone analysis . . . stems from BLM's complete failure to analyze ozone

emissions resulting from the proposed action, rather than from a concern with the adequacy of an

actual ozone analysis."). This contention is belied by the record. In its final EIS, BLM

identified the 8-hour background concentration for ozone in the region adjacent to the WAII

tracts for the period from 2005 through 2007. *See* J.A. 1033. According to the data relied upon

by BLM, the background concentration for that time period was 136 µg/m$^3$, below the NAAQS

of 157 µg/m$^3$ that applied prior to May 2008 and below the 147 µg/m$^3$ standard that applied after

May 2008. *See* J.A. 50, 1033. BLM therefore noted that the area is considered to be in

"attainment" status for ozone, *see* J.A. 1388, something that is conceded by WildEarth Plaintiffs,

*see* WildEarth Pls.' [89] Mem. at 9 (recognizing that "Campbell County is in attainment with the

current ozone NAAQS"). Furthermore, BLM analyzed the effects of $NO_x$ emissions, an ozone

precursor, stating that although there are no anticipated point sources for $NO_x$ emissions at the

mine itself, $NO_x$ emissions are associated with tailpipe emissions from mining equipment and

from trains used to transport coal from the mine. *See* J.A. 1047-48; *see also* WildEarth Pls.' [89]

Mem. at 9 (recognizing that $NO_x$ is an "ozone precursor"). Finally, BLM identified the potential

health risks associated with the inhalation of ground-level ozone, which include acute respiratory

problems, aggravated asthma, decreases in lung capacity, inflammation of lung tissue, and increased susceptibility to respiratory illnesses.  *See* J.A. 1048.

On this record, WildEarth Plaintiffs' suggestion that the BLM completely failed to analyze ozone emissions from the proposed action rings hollow.  And although WildEarth Plaintiffs disclaim any challenge to "the adequacy of [BLM's] actual ozone analysis," WildEarth Pls.' [89] Mem. at 9, the level of detail provided in the final EIS complies with the "rule of reason" that guides this Court's review, *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000).  "It is of course always possible to explore a subject more deeply and to discuss it more thoroughly," but "[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Given the limited point sources for $NO_x$ emissions and the area's ozone attainment status, the level of detail provided by BLM was reasonable even assuming there were a handful of isolated exceedances of the ozone NAAQS between 2001 and 2008.  The Court is satisfied that BLM "adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Theodore Roosevelt Conservation*, 661 F.3d at 75 (quotation marks and citation omitted).

### 2.   $PM_{10}$ Emissions

WildEarth Plaintiffs next contend that "BLM failed to take the requisite hard look at air quality impacts from $PM_{10}$ emissions resulting from lease development."  WildEarth Pls.' [89] Mem. at 11.  Again, this contention is belied by the record.  In its final EIS, BLM identified the environmental and health consequences of $PM_{10}$ emissions and thoroughly considered the impacts that could be expected to result from leasing the WAII tracts for mining operations.  *See*

J.A. 1034-48, 1217-21, 1224.  According to monitoring data relied upon by BLM,[6] the 24-hour background concentration for $PM_{10}$ in the areas adjacent to the WAII tracts for the period from 2005 through 2007 was 78 μg/m$^3$, below the NAAQS of 150 μg/m$^3$.  *See* J.A. 1033.  BLM also openly acknowledged that there was one exceedance of $PM_{10}$ standards in the area in 2005, but explained that the exceedance was attributable to maintenance operations at a nearby railroad line and not mining operations.  *See* J.A. 935, 1037.  On this basis, BLM observed that the area is considered to be in "attainment" status for $PM_{10}$ emissions.  *See* J.A. 1388.  In addition, BLM cited air quality modeling data suggesting that "the projected mine activities at the [WAII tracts] will be in compliance with $PM_{10}$ ambient air standards for the life of the mine at the permitted mining rate . . . ."  J.A. 1217.  Indeed, BLM's modeling analysis indicated that the highest-projected 24-hour $PM_{10}$ concentrations during the "worst-case" years would be 47.8 and 49.9 μg/m$^3$, again below the NAAQS of 150 μg/m$^3$.  *See* J.A. 1038.

BLM also considered information concerning the PRB generally.  Although there were no monitored exceedances of the annual $PM_{10}$ standard in the Wyoming PRB, BLM acknowledged that there were several known exceedances of the 24-hour $PM_{10}$ standard between 2001 through 2007.  *See* J.A. 1217.  Specifically, BLM identified twenty-nine exceedances between 2001 and 2006 and nine exceedances in early 2007.[7]  *See* J.A. 1037.  At the same time, BLM explained that the "exceedances are likely attributable to a variety of causes including long-term drought conditions, associated high winds, contributions from non-mining sources

---

[6]  In projecting the air quality impacts of leasing the WAII tracts for mining operations, BLM reasonably relied on data pertaining to Antelope Coal LLC's existing operations because the mining and emission mitigation methods would be substantially the same at the WAII tracts and the permitted facilities would not change.  *See* J.A. 1041.

[7]  WildEarth Plaintiffs fault BLM for depicting $PM_{10}$ monitoring data in a tabular format highlighting the second- and fourth-highest $PM_{10}$ concentrations between 2005 to 2007, but this presentation was not unreasonable, especially since BLM openly identified known exceedances in the body of its analysis.  *See* J.A. 1036-37.

such as increased traffic on unpaved roads proximate to some of the sampling locations, as well as proximity of un-reclaimed mining activity to sampler locations." J.A. 1037. Furthermore, BLM openly acknowledged that there is a $PM_{10}$ non-attainment zone in Sheridan County, approximately 150 miles from the WAII tracts and attributable to localized sources. *See* J.A. 1388. BLM highlighted that there are no other $PM_{10}$ non-attainment zones within 150 miles of the WAII tracts and that most of the Wyoming PRB is considered to be in "attainment" status for $PM_{10}$ emissions.[8] *See* J.A. 1388.

Meanwhile, despite WildEarth Guardians' assertion to the contrary, BLM did not "gloss over" $PM_{10}$ modeling data for the PRB. WildEarth Pls.' [89] Mem. at 12. In its final EIS, the agency expressly recognized that modeling projected some exceedances of the 24-hour $PM_{10}$ standard, but discounted the data in part on the basis that modeling tends to over-predict 24-hour impacts of surface coal mining—a tendency that is directly reflected in an agreement between EPA and Wyoming environmental authorities that permits greater weight to be placed on $PM_{10}$ monitoring data. *See* J.A. 1041, 1395-97; *see also* WildEarth Pls.' [89] Mem. at 13 (recognizing that BLM discussed the modeling results and explained the basis for its decision to discount those results). As WildEarth Plaintiffs concede, "BLM has the discretion to choose which $PM_{10}$ analysis method it will use to evaluate impacts." WildEarth Pls.' [71] Mem. at 14.

Ultimately, contrary to what WildEarth Plaintiffs may believe, BLM's analysis of the impacts of the $PM_{10}$ emissions attendant to leasing the WAII tracts for mining operations is a far cry from "conclusory." WildEarth Pls.' [89] Mem. at 11. The level of detail provided and the presentation of relevant information are consistent with the "rule of reason" that guides this

---

[8] An air quality modeling summary annexed to the final EIS further suggests that, due to prevailing winds and the distances between mines, it is unlikely that mining at the WAII tracts will contribute to exceedances at neighboring mines. *See* J.A. 1412-13.

Court's review.  BLM "adequately considered and disclosed the environmental impact of its actions and [] its decision is not arbitrary or capricious."  *Theodore Roosevelt Conservation*, 661 F.3d at 75 (quotation marks and citation omitted).

        3.    <u>$NO_2$ Emissions</u>

    WildEarth Plaintiffs further claim that BLM erred in analyzing the impacts of $NO_2$ emissions attendant to leasing the WAII tracts.  But WildEarth Plaintiffs do not dispute that BLM in fact analyzed the impacts of $NO_2$ emissions.  *See, e.g.*, WildEarth Pls.' [71] Mem. at 17. Nor could they, as BLM did so in great detail.[9]  *See* J.A. 1047-54, 1215-25, 1397-98.  WildEarth Plaintiffs instead tender a narrow challenge to BLM's analysis.  Specifically, they argue that "[a]lthough BLM recognized the health risks associated with short-term exposure to $NO_2$, BLM failed to analyze the degree to which the Leases would affect $NO_2$ concentrations on *an hourly basis*."  WildEarth Pls.' [71] Mem. at 17 (emphasis added).  WildEarth Plaintiffs' argument is premised on the assumption that BLM was somehow required to supplement its environmental impacts analysis to apply a 1-hour $NO_2$ standard that was adopted by EPA for the first time more than a year after the final EIS was published.  *See* PRIMARY NATIONAL AMBIENT AIR QUALITY STANDARDS FOR NITROGEN DIOXIDE, 75 Fed. Reg. 6474 (Feb. 9, 2010).  The argument is unavailing for at least three reasons.  First, WildEarth Plaintiffs concede that they first raised this issue in the administrative appeal that they filed in May 2010—after the ROD had been signed— even though the 1-hour $NO_2$ standard was proposed and published in July 2009 and February 2010, respectively.  *See* WildEarth Pls.' [71] Mem. at 16 n.9; WildEarth Pls.' [89] Mem. at 16. By failing to bring the issue to BLM's attention prior to the signing of the ROD, WildEarth Plaintiffs waived their right to pursue the issue in this action.  *Cf. Vermont Yankee Nuclear*

---

[9]  BLM's analysis included a reasonable discussion of mitigation measures for $NO_2$ emissions. *See* J.A. 1051-54.

*Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) ("[W]hile it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions."). Second, as WildEarth Plaintiffs concede, EPA's 1-hour $NO_2$ standard did not become effective until April 2010. *See* WildEarth Pls.' [71] Mem. at 16 n.9. By that time, the ROD had already been signed and there was "no ongoing major Federal action that could require supplementation." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) (quotation marks and citation omitted). Third, EPA's promulgation of the 1-hour $NO_2$ standard does not reflect the sort of "new circumstances or information" triggering an agency's duty to supplement. 40 C.F.R. § 1502.9(c)(1)(ii); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 373 (1989) ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."). BLM's analysis of the impacts of $NO_2$ emissions complies with the "rule of reason" that guides this Court's review. BLM "adequately considered and disclosed the environmental impact of its actions and [] its decision is not arbitrary or capricious." *Theodore Roosevelt Conservation*, 661 F.3d at 75 (quotation marks and citation omitted).

    4. <u>Disturbance and Reclamation</u>

  PRBRC claims that that BLM failed to take the requisite "hard look" at the land and hydrologic disturbance and reclamation that could be expected to result from leasing the WAII tracts for coal mining operations. PRBRC especially faults BLM for failing to adequately

address the absence of and need for so-called "contemporaneous reclamation." *See* 30 C.F.R. §

816.100 ("Reclamation efforts, including but not limited to backfilling, grading, topsoil

replacement, and revegetation, on all land that is disturbed by surface mining activities shall

occur as contemporaneously as practicable with mining operations . . . .").[10]  But in its final EIS,

BLM provided a realistic and detailed appraisal of land and hydrologic disturbance and

reclamation.  BLM analyzed disturbance and reclamation when discussing such matters as

topographic moderation, groundwater quality, surface erosion, vegetation and wildlife, and

visual resources, and it disclosed the associated impacts (*e.g.*, a more uniform topography, soil

erosion, a reduction in wildlife habitat and plant species diversity, the dewatering of coal and

overburden aquifers, loss of wetlands functions, higher concentrations of dissolved solids in

groundwater, etc.).  *See, e.g.*, J.A. 1016-18, 1067-72, 1076-77, 1087-88, 1091-92, 1096-99, 1103,

1153, 1195, 1204, 1210-11, 1225-27, 1237, 1241-42, 1257.

Furthermore, regardless of whether BLM considered the specific extra-record materials

cited by PRBRC, BLM openly acknowledged the temporal gap between surface mining activities

and reclamation.  BLM indicated that the reclamation process "would begin after an area is

mined," but estimated that "two to four years" could elapse between topsoil stripping and

reseeding and recognized that the time lag "would be longer for stockpiles, haulroads, some

---

[10]  Similarly, PRBRC suggests that BLM's analysis of alternatives and mitigation measures
related to disturbance and reclamation was flawed, but PRBRC waived this argument by failing
to raise it in a manner that would have permitted BLM to respond meaningfully during
administrative proceedings.  In any event, the applicable statutory and regulatory framework
does not contemplate instant reclamation or reclamation on an acre-by-acre basis as surface
mining activities proceed.  Rather, reclamation is supposed to occur "as contemporaneous *as
practicable*." 30 C.F.R. § 816.100 (emphasis added); *see also* 30 U.S.C. § 1202(e).  BLM's
consideration of alternatives and mitigation measures was reasonable in light of this framework
and the scope of the contemplated action.  *See Theodore Roosevelt Conservation*, 661 F.3d at 73
("[W]e review both an agency's definition of its objectives and its selection of alternatives under
the rule of reason.") (quotation marks and citation omitted).

sediment-control structures, and other mine facilities." J.A. 1096; *see also* J.A. 1097 (disclosing

that it would take "20 to 100 years" to restore some plant species to pre-mining density levels).

BLM further observed that a "minimum of 10 years" would be required before "completion of

reclamation" and "release of the reclamation bond." J.A. 1097. And BLM also identified the

ratio between disturbed and reclaimed areas in the PRB, breaking the data down into three

categories: areas that are or are projected to be permanently reclaimed; areas that are or are

projected to be undergoing active mining or that are mined but not yet reclaimed; and areas that

are or are projected to be unavailable for reclamation until mining operations are completed.[11]

*See* J.A. 1192, 1194-95. BLM's projections clearly disclosed a gap between disturbed and

reclaimed areas, but showed that the gap was expected to narrow with time. *See* J.A. 1194-95,

1657-58.

     In the final analysis, BLM provided a realistic appraisal of disturbance and reclamation,

which included disclosing the past and projected absence of instant or acre-for-acre reclamation

as surface mining activities proceed. Presented with this appraisal, the ultimate decision-maker

was well positioned to make a "fully informed" decision about the state of and need for

contemporaneous reclamation. *New York*, 681 F.3d at 476. The Court is satisfied that BLM

"adequately considered and disclosed the environmental impact of its actions and that its

decision is not arbitrary or capricious." *Theodore Roosevelt Conservation*, 661 F.3d at 75

(quotation marks and citation omitted).

---

[11] BLM's reliance on actual site conditions instead of bond release statistics was reasonable in
part because the former measures the process of reclamation and the latter measures the ultimate
success of reclamation many years after surface mining activities. *See* J.A. 2683, 2795.

5.      Compliance with 30 U.S.C. § 184(a)

PRBRC also contends that BLM violated NEPA by failing to analyze whether leasing the

WAII tracts would comply with 30 U.S.C. § 184(a), which provides in relevant part:

> No person, association, or corporation, or any subsidiary, affiliate,
> or persons controlled by or under common control with such
> person, association, or corporation shall take, hold, own or control
> at one time, whether acquired directly from the Secretary under
> this chapter or otherwise, coal leases or permits on an aggregate of
> more than 75,000 acres in any one State and in no case greater than
> an aggregate of 150,000 acres in the United States.

30 U.S.C. § 184(a).  Specifically, PRBRC claims that "BLM failed to evaluate whether, in

issuing of [sic] a maintenance lease, Antelope [Coal LLC] and its parent company Cloud Peak

would hold or control at one time coal leases or permits on an aggregated [sic] of more than

75,000 acres in any one State and in no case greater than an aggregated [sic] of 150,000 acres in

the United States."  PRBRC's [70-1] Mem. at 25 (internal quotation marks and citation omitted).

PRBRC reasons that BLM was required to consider whether leasing the WAII tracts to

Antelope Coal LLC would comply with 30 U.S.C. § 184(a) because: first, NEPA requires an EIS

for "major Federal actions significantly affecting the quality of the human environment," 42

U.S.C. § 4332(2)(C); second, the term "significantly" includes the "intensity" of the impact, 40

C.F.R. § 1508.27(b); and third, when evaluating the "intensity" of an action, responsible officials

should consider "[w]hether the action threatens a violation of Federal, State, or local law or

requirements imposed for the protection of the environment," *id.* § 105.27(b)(10).  But PRBRC

offers no rejoinder to the Federal Defendants' argument that 30 U.S.C. § 184(a) was imposed not

for the protection of the environment but rather as an antitrust measure, *see* Fed. Defs.' [79-1]

Mem. at 46-47, countering only that whether the statute "is imposed for the protection of the

environment or not is irrelevant," PRBRC's [86] Mem. at 18.  Based on the absence of a

response, the Court shall treat as conceded the Federal Defendants' argument that 30 U.S.C. §

184(a) was not imposed for the protection of the environment.  *See Hopkins v. Women's Div.,*

*Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C.

Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded."); *accord Lewis v. District*

*of Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (*per curiam*); *see*

*also* 30 U.S.C. § 184(k), (l) (referring to "unlawful trusts" and "antitrust laws").

  Contrary to what PRBRC may think, the conceded fact that 30 U.S.C. § 184(a) was not

imposed for the protection of the environment is anything but "irrelevant."  PRBRC's [86] Mem.

at 18.  PRBRC's irrelevancy argument turns on its interpretation of 40 C.F.R. § 1508.27(b)(10)

as a two-prong inquiry requiring responsible officials to consider "whether the action threatens a

violation of Federal, State, or local law," on the one hand, or "requirements imposed for the

protection of the environment," on the other hand.  40 C.F.R. § 1508.27(b)(10).  Stated

somewhat differently, PRBRC suggests that the phrase "imposed for the protection of the

environment" modifies only "requirements" and not "Federal, State, or local law."  *See*

PRBRC's [86] Mem. at 17-18.  This is a specious and untenable reading of the regulation.  Such

a construction would require responsible officials to contemplate whether a proposed action

might threaten a violation of any federal, state, or local law regardless of its subject or purpose,

but the regulation quite clearly speaks to the factors responsible officials should consider when

evaluating the environmental impacts of agency action.  The most natural reading of the

regulation is that the threatened violation must relate to a law or requirement that is "imposed for

the protection of the environment."  40 C.F.R. § 1508.27(b)(10); *see also Coal. on Sensible*

*Transp. Inc. v. Dole*, 642 F. Supp. 573, 590 (D.D.C. 1986) (characterizing 40 C.F.R. §

1508.27(b)(10) as "requir[ing] consideration of whether a project threatens a violation of federal, state, or local *environmental* laws.") (emphasis added), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987). Indeed, the United States Court of Appeals for the District of Columbia Circuit has interpreted a similar regulation in this way. *See City of Los Angeles v. NHTSA*, 912 F.2d 478, 490 (D.C. Cir. 1990) (interpreting 49 C.F.R. § 520.5(b)(6)(i)), *overruled on other grounds by Fla. Audubon*, 94 F.3d at 669.

Because it is conceded that 30 U.S.C. § 184(a) was not imposed for the protection of the environment, and because 40 C.F.R. § 1508.27(b)(10) only requires responsible officials to consider whether a proposed action threatens a violation of laws imposed for the protection of the environment, there was no need for BLM's NEPA analysis to address whether leasing the WAII tracts would comply with 30 U.S.C. § 184(a). PRBRC's claim that BLM acted arbitrarily and capriciously by failing to analyze compliance with Section 184(a) is without merit.

\* \* \*

In the end, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Methow Valley*, 490 U.S. at 351. The Court finds that BLM's final EIS considers the significant environmental impacts of leasing the WAII tracts for coal mining operations, thereby enabling the ultimate decision-maker to make a "fully informed" decision. *New York*, 681 F.3d at 476. Although Plaintiffs understandably disagree with the substantive outcome, the Court is satisfied that BLM "adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Theodore Roosevelt Conservation*, 661 F.3d at 75 (quotation marks and citation omitted). Accordingly, the Court shall enter judgment in Defendants' favor on Plaintiffs' NEPA claims.

C.    *Plaintiffs' Remaining FLPMA Claims*

WildEarth Plaintiffs claim that BLM violated the FLPMA by failing to "ensure that its leasing decisions would comply with the NAAQS for ozone, $PM_{10}$, and $NO_2$." WildEarth Guardians' [71] Mem. at 33.  WildEarth Plaintiffs' arguments in this vein are duplicative of its NEPA arguments, and fail for the same reasons discussed above.  *See supra* Part IV.B.  More to the point, neither the FLPMA nor the implementing regulations required BLM to analyze whether and to what degree the leasing of the WAII tracts would comply with national ozone, $PM_{10}$, and $NO_2$ standards.  WildEarth Plaintiffs offer a single concrete source for this supposed obligation, but the cited regulation simply provides that "[e]ach land use authorization shall contain terms and conditions which shall . . . require compliance with air and water quality standards established pursuant to applicable Federal or State law."  43 C.F.R. § 2920.7(b)(3).  BLM satisfied this obligation by preparing a lease for the WAII tracts requiring compliance with air and water quality standards.  *See* J.A. 1707.  Accordingly, the Court shall enter judgment in Defendants' favor on WildEarth Plaintiffs' FLPMA claims.

D.    *Plaintiffs' Remaining ESA Claims*

Under the ESA, a federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat . . . ."  16 U.S.C. § 1536(a)(2).  If the agency determines that a contemplated action "may [adversely] affect listed species or critical habitat," then it must engage in "formal consultation" with the appropriate consulting agency—here, FWS.  50 C.F.R. § 402.14(a).  However, "informal consultation" will suffice if the agency determines, "with the written concurrence of the Director [of FWS], that the proposed action is not likely to adversely affect

any listed species or critical habitat." *Id.* § 402.14(b)(1); *see also id.* § 402.13(a) ("If during informal consultation it is determined by the Federal agency, with the written concurrence of [FWS] that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.").  Moreover, "if the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994), *cert. denied* 514 U.S. 1082 (1995).

In this case, BLM prepared a biological assessment to ascertain whether leasing the WAII tracts for coal mining operations would affect listed species or critical habitat.  *See* J.A. 1512-43. Relying on monitoring data, BLM first found that the only listed species within the general analysis area was the Ute ladies'-tresses orchid and that the only other listed species relatively nearby was the black-footed ferret.  *See* J.A. 1527-34.  After taking into account each species' biological and environmental needs and the anticipated effects of the proposed action, BLM determined that the proposed leasing is "not likely to adversely affect" the Ute ladies'-tresses orchid because, among other things, "[s]urveys of the existing suitable habitat at the Antelope Mine and other mines in th[e] area have not found Ute ladies'-tresses" and any lease would require a "100-foot no-disturbance buffer zone" covering potential habitat.  J.A. 1530.  BLM also determined that the proposed leasing "would have no effect" on the black-footed ferret, highlighting "the documented absence of black-footed ferrets in the region" and "the distance of the [leasing] area from future reintroduction sites."  J.A. 1533.  Subsequently, FWS concurred in writing that that the proposed leasing is not likely to adversely affect the Ute ladies'-tresses orchid and, although not required, acknowledged BLM's determination that the proposed project would have no effect on the black-footed ferret.  *See* J.A. 34.

WildEarth Plaintiffs claim that the Federal Defendants acted arbitrarily and capriciously by engaging in informal instead of formal consultation.  *See* WildEarth Pls.' [34] Compl. ¶¶ 129-35.  But the linchpin of WildEarth Plaintiffs' claim is that BLM was required to consider the climate change impacts of leasing the WAII tracts for coal mining operations.  *See, e.g.*, *id.* ¶ 132 (faulting BLM for failing to consider "the climate change impacts related to the inevitable burning of the coal in coal-fired power plants").  Had BLM done so, WildEarth Plaintiffs posit, then the agency might not have found that leasing the WAII tracts for coal mining operations is unlikely to adversely affect the Ute ladies'-tresses orchid and will have no effect on the black-footed ferret.  *See, e.g.*, *id.* ¶ 133.  However, as set forth in detail above, WildEarth Plaintiffs have failed to establish that they have standing to pursue such an argument in this case.  *See supra* Part IV.A.  Meanwhile, WildEarth Plaintiffs offer no other reason why BLM should have engaged in formal instead of informal consultation.  Ultimately, because FWS concurred in writing with BLM's determination that proposed leasing is not likely to adversely affect the Ute ladies'-tresses orchid, informal consultation was sufficient.  *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1).  Furthermore, because BLM determined that the proposed leasing would have no effect on the black-footed ferret, no further consultation was required.  *See Pac. Rivers Council*, 30 F.3d at 1054 n.8.  The Court shall therefore enter judgment in Defendants' favor on WildEarth Plaintiffs' ESA claims.

/

/

/

/

/

## V.  CONCLUSION

The Court has considered the remaining arguments tendered by Plaintiffs and has concluded that they are without merit.   Therefore, and for the reasons set forth above, Plaintiffs' [70, 71] Motions for Summary Judgment shall be DENIED and Defendants' [74, 75, 79] Cross-Motions for Summary Judgment shall be GRANTED.  An appropriate Order and Judgment accompanies this Memorandum Opinion.

Date:   July 30, 2012

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge